Donna Snow BURKS and Larry Burks *v.*
ARKANSAS DEPARTMENT OF HUMAN SERVICES

CA 00-1064                                    61 S.W.3d 184

Court of Appeals of Arkansas
Divisions II and III
Opinion delivered November 28, 2001

72

*Timothy C. Sharum*, for appellant.

*Kathy L. Hall*, Office of Chief Counsel, for appellee.

TERRY CRABTREE, Judge. The appellants, Larry and Donna Burks, appeal from an order from the Sebastian County Chancery Court, in which the court terminated their parental rights. Larry and Donna are separate appellants in this case. Appellants argue on appeal that the appellee, Arkansas Department of Human Services ("DHS"), did not meet its burden of proof, and that DHS was required, but failed to submit, expert testimony pursuant to the Indian Child Welfare Act. We find no error, and affirm.

On September 20, 1996, the appellee filed a petition for emergency custody of Joseph Burks, born January 7, 1996, alleging that the child was dependent/neglected under Arkansas law. An affidavit from a DHS caseworker alleged that the child had suffered a fractured femur and the mother's explanation of how the injury occurred was inconsistent with the type of injury. An Order for Emergency Custody was entered, and on November 18, 1996, an Agreed Adjudication Order was entered and the child was adjudicated as dependent/neglected with custody remaining with DHS.

A similar proceeding took place with appellants' minor child Larry Ray Burks, born January 6, 1995. An affidavit from a DHS caseworker alleged an incident of abuse by Mr. Burks. An Agreed Adjudication Order was also entered on November 18, 1996, custody continuing with DHS.

Appellants were directed to do certain things to reach the goal of reunification, including a psychological evaluation, completion of parenting classes, visiting regularly with the children, and cooperating with the DHS caseworker. Review hearings were conducted throughout 1997, with a review order entered on August 12, 1997, returning custody of the children to appellants, with a protective services case continued by DHS. The court entered a review order on February 4, 1998, in which it found that appellants had complied with the court's orders and the DHS case plan.

On June 16, 1998, Mrs. Burks reported to her caseworker that Mr. Burks had whipped the two older boys with a belt and had left bruises from the incident. She stated that she left Mr. Burks. A review hearing was held on June 30, 1998, in which the court continued custody with the mother, appellant Mrs. Burks. Mr. Burks did not appear, but was ordered to have no contact with the children or Mrs. Burks, and was to attend counseling for anger management and domestic violence issues. Mrs. Burks was ordered not to have any contact with Mr. Burks.

Another review hearing was held on December 1, 1998, at which neither of the appellants appeared. The court issued a bench warrant for Mrs. Burks, and she was arrested on January 28, 1999. That same date, custody of the children was placed with DHS. DHS also filed a petition for emergency custody of appellants' youngest child, William Burks, born December 10, 1997, and custody was placed with DHS. Review hearings were subsequently held, in which Mrs. Burks was told not to have any contact with Mr. Burks. On January 6, 2000, the court found that the goal was

to reunify the children with Mrs. Burks. Mrs. Burks was ordered to report if she learned the whereabouts of Mr. Burks, saw him, or talked to him.

■ On February 15, 2000, appellee filed for termination of parental rights. The court entered an order terminating appellants' parental rights and granting power to consent to adoption as to the appellants' children. It is from this order that appellants appeal.

Arkansas Code Annotated § 9-27-341(b)(3)(Supp. 2001) provides that:

> (3) An order forever terminating parental rights shall be based upon a finding by clear and convincing evidence;
>
> (A) That it is in the best interest of the juvenile, including consideration of the following factors:
>
>> (i) The likelihood that the juvenile will be adopted if the termination petition is granted; and
>>
>> (ii) The potential harm, specifically addressing the effect on the health and safety of the child, caused by continuing contact with the parent, parents, or putative parent or parents;
>
> (B) Of one (1) or more of the following grounds:
>
>> (i)(a) That a juvenile has been adjudicated by the court to be dependent-neglected and has continued out of the home for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the home and correct the conditions which caused removal, those conditions have not been remedied by the parent.

In this case, appellee cited (3)(B)(i)(a) as the grounds on which it sought to terminate parental rights. Further, the children are of Cherokee Indian descent through their father, and thus this case is controlled by the Indian Child Welfare Act, 25 U.S.C. § 1901 *et seq.* The Indian Child Welfare Act in 25 U.S.C. § 1912(f) (1988) provides in pertinent part that:

> No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony by qualified expert

witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

■ Thus, it must be shown by proof beyond a reasonable doubt that the continued custody with appellants is likely to result in serious emotional or physical damage to the children. Appellants argue this burden has not been met. We disagree, and note that the trial court specifically states on page two of its opinion that it finds the "Department has proved all the necessary elements of the case beyond a reasonable doubt."

■ In chancery cases we review the case *de novo*, but we do not reverse findings of the chancellor unless they are clearly erroneous or clearly against the preponderance of the evidence Ark. R. Civ. P. 52(a); *Presley v. Presley*, 66 Ark. App. 316, 989 S.W.2d 938 (1999). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite conviction that a mistake was committed. *Turner v. Benson*, 59 Ark. App. 108, 953 S.W.2d 596 (1997). In reviewing a chancery court's findings, we give due deference to the court's superior position to determine the credibility of the witnesses and the weight to be accorded their testimony. *Hunt v. Hunt*, 341 Ark. 173, 15 S.W.3d 334 (2000).

As to the evidence with respect to Mr. Burks, it showed that Mr. Burks was ordered to undergo anger management and domestic violence counseling, however Mr. Burks attended one meeting and never returned. Mr. Burks failed to exercise any visitation with the children from June 1998 through January 1999, during which time he could have visited with the children. There were also the allegations of the whipping with the belt leaving bruises on two of the children. Also, initially Joseph Burks, was taken by DHS as a result of allegations of abuse when his leg was broken. Further, allegations of abuse were what prompted DHS to take Larry Ray Burks as well.

The evidence as to Mrs. Burks showed that she maintained daily contact with Mr. Burks after being ordered not to do so. She was ordered by the court to report if she knew where Mr. Burks was, or if she heard from him. She did not follow these orders. Paula Davis testified that Mrs. Burks dropped Mr. Burks off at work every morning. The trial court noted that Mrs. Burks said at the hearing that if DHS would get out of her life she would reunite with Mr. Burks, and would return the children to their home.

■ Based on the above evidence, we hold that the chancellor did not err when he found that appellee had proven all the necessary elements of the case beyond a reasonable doubt.

■ Next, Mrs. Burks argues that appellee failed to present expert testimony to support its allegations as required by the Indian Child Welfare Act. Under 25 U.S.C. § 1912(f), in order for parental rights to be terminated, not only must appellee's case be proven beyond a reasonable doubt, it must also be supported by the testimony of "qualified expert witnesses." Guidelines for state courts have been promulgated by the Bureau of Indian Affairs to assist in defining a qualified expert witness under the Act. 44 Fed Reg. 67584 (1979). While not binding on this court, section D.4(b) of the guidelines sets the following as the persons who are most likely to meet the requirements of a qualified expert witness for purposes of Indian child custody proceedings:

> (i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs . . .

> (ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians . . .

> (iii) A professional person having substantial education and experience in the area of his or her specialty. ·

In the case at bar, Mr. Artie Marino, an occupational therapist, testified that he has a degree in occupational therapy, and is knowledgeable and experienced in the area of psychology. He has been working with children since 1994, and has previously worked as a residential counselor for emotionally disturbed children. He has experience working with children who have witnessed domestic violence or have been victims of domestic violence. He has worked with Joseph Burks intermittently since May 1997. Appellee asked Mr. Marino, to opine whether Joseph exhibited any signs of being involved in a domestic violence situation. Mr. Burks objected to the question on the basis that the witness was not qualified. Appellee responded that even though Mr. Marino does not have any credentials in psychology, he does have experience in counseling and in domestic violence. The court then overruled the objection. Mr. Marino testified that Joseph was very delayed, not developing his fine motor skills properly, and was exhibiting behaviors he would have gone through at age one or two had he been in a safe environment. Mr. Marino testified that when he visited with Joseph last, in April 1999, he was performing at twenty-two months when his

chronological age was thirty-eight months. He testified that Joseph has progressed while he has been in therapy.

Ms. Jackie Hamilton, the director of the Domestic Violence Intervention Program, testified that appellant, Mr. Burks, inquired about a domestic violence program, but did not attend the sessions. Ms. Hamilton testified without objection. Hamilton testified that domestic violence is not a "quick fix thing" and that her program lasts twenty-six weeks. She testified that statistically, victims leave their abusers six times before they finally leave for good. She also testified that children learn to act violently from watching their parents, and testified about the emotional and physical problems that would likely occur in these children as a result of witnessing domestic violence. She further testified that from an emotional standpoint, the symptoms are identical from children who have been in a violent home and observed violent behavior, with children who have been sexually abused. She testified that children who are raised in a violent home are twenty-four times more likely to commit rape or assault against another individual, and they are seventy-four percent more likely to commit a crime against a person.

■ We hold that the above testimony was sufficient to satisfy the qualified expert witness testimony requirement of the Indian Child Welfare Act. We hold that Mr. Marino and Ms. Hamilton possess adequate experience, and have unique qualifications to sufficiently satisfy the statute's requirements. We note that the Cherokee Nation agreed at trial that the parental rights of appellants should be terminated. We have found nothing in the record to suggest that the purpose of the Act has been compromised in this case.

Affirmed.

ROBBINS, BIRD, and BAKER, JJ., agree.

VAUGHT and JENNINGS, JJ., dissent.

JOHN E. JENNINGS, Judge, dissenting. I am unable to agree that the requirements of the federal statute, 25 U.S.C. § 1912(f) have been met in this case. Perhaps the leading case in this area of the law is *In the matter of N.L. v. Moore, 754 P.2d 863* (Okla. 1988). There the Oklahoma Supreme Court said:

> Testimony showing that continued custody of the child by the parent is likely to result in serious emotional or physical harm to

the child is necessary. Testimony from a qualified expert witness indicating that such harm will result from continued custody of the parent is sufficient. Where cultural bias is clearly not implicated, expert witnesses who do not possess special knowledge of Indian life may provide the necessary proof that continued custody of the child by the parent will result in serious emotional or physical harm to the child.

*Id.* at 868 (citations omitted).

Social workers may qualify as expert witnesses under the Act but to do so they must possess "expertise beyond the normal social worker qualifications." *In the Matter of N.L. v. Moore, id.; State ex rel. Juvenile Dep't v. Charles,* 688 P.2d 1354 (Or. Ct. App. 1984); *In re Fisher,* 643 P.2d 887 (Wash. Ct. App. 1982); *In the Matter of M.E.M.,* 635 P.2d 1313 (Or. 1981).

Mr. Marino, an occupational therapist, clearly does not qualify as an expert witness under the Act, and not even the department contends that he does. On this record I cannot conclude that Ms. Hamilton has been shown to possess "expertise beyond the normal social worker qualifications." Furthermore, I cannot say that cultural bias is clearly not implicated in the case at bar. Finally, neither Mr. Marino nor Ms. Hamilton testified that the continued custody of the child by the parent would be likely to result in serious emotional or physical damage to the child. *See In the Matter of N.L. v. Moore, supra; In the Matter of Morgan v. Morgan,* 364 N.W.2d 754 (Mich. Ct. App. 1985).

Apart from the question of whether the federal statute has been complied with, I have other concerns. The department's involvement began when one of the children suffered a broken leg under suspicious circumstances. The children were returned to the home until Mr. Burks spanked them hard enough to leave bruises, and the court ordered Mrs. Burks to have no contact with Mr. Burks. At this point the department's goal was to reunify the children with Mrs. Burks. It appears that she complied with the instructions of the department and the orders of the court except that, when Mr. Burks' car broke down, she took him back and forth to work. This clearly precipitated the department's decision to terminate her parental rights.

I neither condone nor excuse Mrs. Burks' conduct, but question whether this a sufficient basis to seek to sever the bond between mother and child. I recognize that both the trial court and

the department are hurried by the legal requirements as to time imposed by Ark. Code Ann. § 9-27-337 & -338 (Supp. 1999), as well as the practical consideration that a child neither returned to the home nor given a new permanent home will soon become an adult. Even so, we might do well to remember the supreme court's admonition in *Bush v. Dietz*, 284 Ark. 191, 680 S.W.2d 704 (1984):

> The best interest of the child is a matter of primary concern in adoption proceedings. Termination of the maternal relationship is much more far reaching than a change of custody. Adoption changes the natural relationship between parent and child; it changes the course of lives, the manner of inheritance, the people with whom the child associates, and cuts the ties and relationship between the child and the family of the parent whose rights are terminated. To make a decision based solely upon the best interest of the child could be a dangerous thing. A literal interpretation of what is in the best interest of the child could conceivably lead to a decision to award the child to the parties who were able to furnish the most material things for the comfort and pleasures of life. The wealthy, even though strangers, could take the children of the poor because the children would obviously be better off in a home of plenty. The phrase "best interest of the child" means more than station in life and material things. "Best interest of the child" includes moral, spiritual, material and cultural values, matters of convenience and friends and family relationships. We have recognized as a cardinal principle of law and nature that parents who are able to support their child in their own style of life, however poor and humble they might be, should not be deprived of parental privileges, except when urgently necessary to afford the child reasonable protection. (Citation omitted.)

I respectfully dissent.

VAUGHT, J., joins in this opinion.