

# ARKANSAS COURT OF APPEALS

DIVISION IV
**No.** CV-15-903

| | |
|---|---|
| BROOKE NEWMAN AND BRENT NEWMAN<br><br>APPELLANTS<br><br>V.<br><br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD<br>APPELLEES | **Opinion Delivered** April 13, 2016<br><br>APPEAL FROM THE SEBASTIAN COUNTY CIRCUIT COURT, FORT SMITH DISTRICT [NO. JV-13-312]<br><br>HONORABLE ANNIE HENDRICKS, JUDGE<br><br>AFFIRMED |

## LARRY D. VAUGHT, Judge

Appellants Brooke and Brent Newman appeal from the orders entered by the Circuit Court of Sebastian County terminating their parental rights to their son C.N. (a member of the Cherokee Nation[1] who was born on July 7, 2012) and denying their posthearing motion to set aside the termination decision or for new trial. The Newmans raise three issues on appeal. They first argue that the trial court abused its discretion in denying their motion to dismiss the termination petition because appellee, the Arkansas Department of Human Services (DHS), filed the petition outside the fifteen-month timeline required by Arkansas Code Annotated section 9-27-359(c) (Repl. 2015). Second, they argue the trial court clearly erred in finding that clear and convincing evidence supported the termination decision. And finally, they argue that the trial court abused its discretion in denying their motion to set aside

---

[1] Because C.N. is of Cherokee Indian descent, the Indian Child Welfare Act, 25 U.S.C. § 1901 *et seq.*, applies.

the termination decision or for new trial based on the trial court's failure to enter a timely termination order as required by Arkansas Code Annotated section 9-27-341(e). We affirm.

On May 19, 2013, DHS obtained a 72–hour hold on C.N. after medical professionals reported to police that he had a one-week-old broken arm and that the Newmans failed to provide a sufficient account as to how the injury was caused or why they delayed in seeking medical treatment. DHS filed a petition for emergency custody on May 28, 2013, which was granted that same day. Following an adjudication hearing, an order finding C.N. dependent-neglected was entered on September 10, 2013. In the adjudication order, the court credited the testimony of Dr. Chris Bell and registered nurse Jeanne Losurdo, who testified that the Newmans allowed C.N. to suffer through significant pain for several days before seeking medical attention for him and that C.N. would not have been pain free and using his broken arm in the manner described by the Newmans. The trial court also noted evidence of domestic violence, much of which occurred in the presence of C.N.; violation of no-contact orders and orders of protection; lying to police officers; the Newmans' volatile relationship; and Brent's criminal history involving assault and battery of household members. The court set the goal for the case as reunification and ordered the Newmans to visit C.N.; attend marriage counseling; obtain and maintain stable housing, employment, and transportation; remain drug and alcohol free; submit to random drug testing; undergo drug-and-alcohol assessments; and submit to psychological evaluations. Brent was ordered to complete a domestic-violence course.

A permanency-planning hearing was held on April 30, 2014, wherein the court found that it was not in C.N.'s best interest to return to the custody of his parents because it would

place him at risk of harm. The trial court also found that concurrent goals of reunification and adoption were appropriate.

A fifteen-month review hearing was held August 24, 2014. While the trial court found that the Newmans had completed many of the requirements of their case plan, it further found that C.N. was in need of DHS services and that returning him to the custody of his parents was contrary to his welfare. The trial court noted that the representative of the Cherokee Nation and C.N.'s attorney ad litem agreed that C.N. should not be returned to the Newmans at that time. The court also pointed out that DHS had expressed an intent to file a petition to terminate the Newmans' parental rights to C.N. The trial court continued the concurrent goals of reunification and adoption.

On January 12, 2015, DHS filed a petition to terminate the Newmans' parental rights, alleging three grounds: (1) the failure-to-remedy ground pursuant to Arkansas Code Annotated section 9-27-341(b)(3)(B)(i)(*a*); (2) the subsequent-factors ground pursuant to section 9-27-341(b)(3)(B)(vii)(*a*); and (3) the aggravated-circumstances ground pursuant to section 9-27-341(b)(3)(B)(ix)(*a*)(*3*)(*A*).

The termination hearing was held on March 13, 2015. Brent Newman testified his relationship with Brooke was great, although he conceded that they had gone through some "rocky points" in the past and that they both "ha[d] tempers." He admitted that he had been convicted of battering Brooke, that she had called the police "quite a few times" accusing him of mistreating her, and that he had been arrested three times following Brooke's calls to the police. He described two of his arrests. One arrest occurred after he and Brooke used a baseball bat to destroy each other's belongings. Another occurred on Christmas Eve 2014. He

SLIP OPINION

said that he had been asleep when he was told that someone was knocking at his door and looking into the window. He opened the door, identified himself to the officer as "Puddin Tane," and turned around to go back into his apartment. He said that the officer assaulted him, grabbing him from behind and ripping his shirt. Brent denied drinking alcohol that night.

As for the incident that gave rise to DHS's custody of C.N., Brent testified that he did not cause C.N.'s arm injury. However, he stated that approximately one week before they took C.N. to the doctor, he (Brent) rolled over on the floor to get up, and his "knee was on" C.N.'s arm.

Brent conceded that he was an alcoholic and had a problem with methamphetamine; however, he added that he last drank alcohol and used meth in October 2014. He further testified that he had maintained housing for the past year and had maintained employment for the past two years. He stated that he attended domestic-violence classes, regularly attended AA/NA meetings, completed drug-and-alcohol assessments, attended individual and marriage counseling, had a psychological evaluation, and attended parenting classes. He stated that he visited C.N. regularly and that the visitations had gone well.

Brooke testified that her six-year relationship with Brent suffered from problems because of Brent's alcohol problem and his temper. She admitted that she had told the caseworker that she feared Brent when he drank alcohol and that she wanted "out of the marriage" in November 2014. However, according to Brooke, since that time things with Brent had improved. Brooke stated that she did not know how C.N.'s arm was broken and that she did not believe that Brent intentionally broke C.N.'s arm. She admitted that she and Brent should have realized that it was broken.

SLIP OPINION

Brooke conceded that she was a drug addict. She said that during the DHS case she and Brent used methamphetamine, she smoked marijuana, and they had positive drug tests. She also stated that Brent attempted to defeat drug tests. However, she said that she attended parenting classes, a drug assessment, AA/NA meetings, a psychological evaluation, and individual and marriage counseling. She also said that she attended every visit with C.N.

Several Fort Smith police officers testified at the termination hearing. Officer Matt McHam testified that on April 9, 2014, he responded to a disturbance call made by the Newmans' neighbor. McHam stated that Brooke reported that she and Brent had gotten into a fight about a sandwich and that both of them used a baseball bat to destroy each other's personal items. McHam said that he arrested both parties. Officer Andrew Adams testified that on April 10, 2014, Brent wanted to file charges against Brooke for throwing a potted plant through the window of their apartment. On May 16, 2014, Officer Jeffrey Lum responded to a disturbance call placed by Brent. Brent reported that Brooke had thrown a rock through the window after they had gotten into an argument.

The fourth and final police officer to testify was Nathan Sosebee. He said that on December 24, 2014, he responded to a disturbance call made by the Newmans' neighbor. Sosebee testified he knocked on the Newmans' apartment door, and Brent aggressively opened it. Sosebee said that Brent and Brooke were yelling and cursing at him. Sosebee asked for Brent's name, to which Brent responded, "Puddin Tane." Brent then said, "F*** you," turned around, and tried to go back into the apartment. Sosebee grabbed Brent's wrist and told him he was under arrest. Brent pulled away, and Sosebee grabbed Brent's shirt, which ripped. Sosebee testified that Brent's breath smelled strongly of alcohol and that he believed

that Brent was intoxicated. Sosebee, who had his Taser out, said that he and Brent argued back and forth before Brent eventually exited the apartment, provided his name, and was arrested. A portion of the incident was recorded by the Taser, and the recording was played at the hearing.

DHS caseworker Rebecca Newton said that DHS had offered parenting classes, psychological evaluations, counseling, drug-and-alcohol assessments, random drug testing, hair-follicle testing, marriage counseling, and visitation. Newton testified that Brooke was cooperative with drug testing and admitted her meth and marijuana use. Brent was not cooperative. Newton stated that he shaved his body to avoid hair-follicle testing and that once he provided a cold urine sample. Newton testified that the Newmans both tested positive for meth in April or May 2014 and that Brent tested positive for meth in February 2015.

Newton testified that DHS recommended that the Newmans' parental rights to C.N. be terminated. She said that C.N. was removed from their custody as a result of medical neglect and failure to protect and that those situations had not been remedied. She said that neither party took full responsibility for C.N.'s injury. Newton also had concerns about the Newmans due to the complaints made by their neighbors, Brent's temper, Brent's and Brooke's violence toward each other, their aggressive response to the police in December 2014, and their continued drug-and-alcohol use. She noted that they were not honest with their therapist because they denied having drug-and-alcohol addictions. Newton believed that the Newmans represented a serious risk of harm to C.N. because he could get caught in the "crossfire." She

lso testified that C.N. was adoptable and that someone had expressed an interest in adopting him.[2]

Tad Teehee, the tribe representative for the Cherokee Nation, testified that he had attended every hearing in the case and had interacted with the Newmans. He stated that DHS had provided reasonable and active services to the Newmans in an effort to give them the greatest chance at having C.N. returned safely to them. He said that after twenty-two months, it was his opinion that C.N. could not safely return to the Newmans and that he would likely suffer serious emotional or physical damage if returned to them. Teehee cited the Newmans' very volatile relationship, their drug use, Brent's angry temper, and the fact that they had not learned anything in their classes. He stated that the Taser video demonstrated their inability to make competent and appropriate decisions. He also stated that C.N. was adoptable and that the Newmans' parental rights should be terminated.

Therapist Joanie Henry testified that she had provided individual and marriage counseling to the Newmans. Henry acknowledged that the Newmans had an abusive relationship that was triggered by drugs and alcohol. She said that Brooke and Brent did not know how C.N.'s arm was broken. However, it was her belief that the Newmans had made progress, individually and in their relationship, as a result of counseling. She further testified that she did not believe that the Newmans posed a serious risk of harm to C.N.

At the conclusion of the hearing, the trial court orally granted the termination petition. No termination order was entered. On July 8, 2015, the Newmans filed a motion to set aside

---

[2] Lydia Dorr testified that she had been C.N.'s foster parent since May 20, 2014, that C.N. was a great child, that she had a strong bond with him, and that she wanted to adopt him.

the termination decision or for new trial. They argued that because the trial court did not enter a termination order within thirty days of its oral termination decision, the decision should be set aside to prevent a miscarriage of justice pursuant to Arkansas Rule of Civil Procedure 60(a), or alternatively, they should receive a new trial because the irregularity in the proceedings prevented them from having a fair trial pursuant to Arkansas Rule of Civil Procedure 59(a)(1).

On August 12, 2015, the trial court entered an order terminating the Newmans' parental rights. The trial court found beyond a reasonable doubt that DHS had proved all three grounds alleged, that termination was in C.N.'s best interest, that C.N. was adoptable, and that continued custody of C.N. by his parents would result in serious physical or emotional harm. The court found that DHS had made active efforts to provide remedial services and rehabilitative programs to prevent the breakup of the Indian family and that a Cherokee Nation representative had been present throughout the case and had provided the necessary expert testimony to support the termination decision.

Two weeks later, on August 26, 2015, a hearing was held on the Newmans' motion to set aside the termination decision or for new trial. At the hearing, Brooke testified that on June 10, 2015, Brent was arrested, and was still incarcerated, for assaulting and battering her. She said that she left her job the next day due to emotional stress. On August 28, 2015, the trial court entered an order denying the Newmans' motion to set aside the termination decision or for new trial. This appeal followed.

The Newmans' first point on appeal challenges the trial court's denial of their motion to dismiss the termination petition. Our standard of review for the denial of a motion to dismiss is whether the trial court abused its discretion. *Ark. Dep't of Human Servs. v. Fort Smith*

*Sch. Dist.*, 2015 Ark. 81, at 5, 455 S.W.3d 294, 298. The Newmans contend that the trial court abused its discretion in denying their motion because DHS untimely filed it in violation of Arkansas Code Annotated section 9-27-359(c), which provides: "If the court determines the permanency goal to be adoption, the department shall file a petition to terminate parental rights no later than the fifteenth month of the child's entry into foster care." Based on this language and the undisputed fact that the termination petition was filed after C.N.'s fifteenth month in foster care, the Newmans contend that the trial court was divested of subject-matter jurisdiction to hear the termination petition.

A similar argument was made and rejected by our court in *Hill v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 108, 389 S.W.3d 72. There, the appellant argued that the trial court erred in denying her motion to dismiss for failing to hold the termination hearing within ninety days after the filing of the termination petition in violation of Arkansas Code Annotated section 9-27-341(d). The appellant argued that because of the violation, the trial court lost jurisdiction to hear the petition after the ninety-day period had expired. *Id.* at 4–5, 389 S.W.3d at 74–75. We disagreed, holding that while the applicable statute spoke in mandatory terms, a loss of jurisdiction did not follow because the General Assembly did not provide a sanction for an untimely filing and because there was no evidence that such a result was intended. *Id.* at 5, 389 S.W.3d at 75. Accordingly, we held that the failure of the trial court to hold the termination hearing within ninety days of the filing of the petition did not deprive the trial court of jurisdiction. *Id.* at 6, 389 S.W.3d at 75. We also concluded that reversal was not appropriate in the absence of a showing of prejudice resulting from the delay. *Id.*, 389 S.W.3d at 75.

SLIP OPINION

We hold that the same analysis applied to section 9-27-341 in *Hill* applies to section 9-27-359(c). Although section 9-27-359(c) is mandatory, the General Assembly did not provide a sanction for the failure to file a termination petition within the prescribed time, and there is no statutory language that a loss of jurisdiction follows from an untimely filing. Further, the Newmans failed to demonstrate prejudice suffered because of the delay in the filing of the termination petition. To the contrary, the delay was a benefit to the Newmans because they were afforded an additional five months to work the case plan and receive DHS services. Accordingly, we hold that the trial court did not abuse its discretion in denying the Newmans' motion to dismiss.

For their second argument, the Newmans challenge the sufficiency of the evidence supporting the trial court's termination decision. We review termination-of-parental-rights cases de novo. *Ford v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 226, at 2, 434 S.W.3d 378, 380. At least one statutory ground must exist, in addition to a finding that it is in the child's best interest to terminate parental rights; these must be proved by clear and convincing evidence. *Id.,* 434 S.W.3d at 380 (citing Ark. Code Ann. § 9-27-341). In making a best-interest determination, the trial court is required to consider two factors: (1) the likelihood that the child will be adopted, and (2) the potential of harm to the child if custody is returned to a parent. *Id.,* 434 S.W.3d at 380. Adoptability is not an essential element but is rather a factor that the trial court must consider. *Id.,* 434 S.W.3d at 380. Likewise, the potential harm to the child is a factor to be considered, but a specific potential harm does not have to be identified or proved by clear and convincing evidence. *Id.,* 434 S.W.3d at 380. The potential-harm

analysis is to be conducted in broad terms. *Id.,* 434 S.W.3d at 380. The best-interest finding must be supported by clear and convincing evidence. *Id.,* 434 S.W.3d at 380.

Clear and convincing evidence is that degree of proof that will produce in the factfinder a firm conviction as to the allegation sought to be established. *Id.,* 434 S.W.3d at 380. The appellate inquiry is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Id.,* 434 S.W.3d at 381. Credibility determinations are left to the factfinder, here the trial court. *Id.,* 434 S.W.3d at 381.

The trial court found that DHS met its burden of proving all three statutory grounds alleged in the termination petition. Only one ground is necessary to terminate parental rights, *Lee v. Ark. Dep't of Human Servs.*, 102 Ark. App. 337, 345, 285 S.W.3d 277, 282 (2008), and we hold that the trial court did not clearly err in finding that DHS proved the failure-to-remedy ground. C.N. had been out of the Newmans' home for twenty-two months and had been adjudicated dependent-neglected. The trial court found that despite the services provided by DHS, the Newmans had not remedied the conditions that caused removal of the child. The trial court found that C.N.'s injury was caused by a violent act and not someone "roll[ing] over on th[e] child." The evidence demonstrated that the parties' pattern of domestic violence continued. There were four calls to police reporting the parties' violent behavior. As a result, Brent was arrested twice and Brooke was arrested once. The Taser video, which the trial court specifically referenced in its order, demonstrated their continued violent behavior and inappropriate decision making. After the termination hearing, Brent had assaulted Brooke again and remained incarcerated for that offense. The parties' pattern of drug use and Brent's

11

alcohol use continued. Finally, there was evidence that the parties failed to accept responsibility for C.N.'s injury.

This same evidence supports the trial court's finding that termination of the Newmans' parental rights was in C.N.'s best interest. There was evidence that C.N. was adoptable. And we cannot say that the trial court clearly erred in finding that the combination of the long-standing pattern of physical abuse and substance abuse created an environment that posed a serious and unreasonable risk of harm to the health and safety of C.N. A parent's past behavior is often a good indicator of future behavior. *Ford*, 2014 Ark. App. 226, at 3, 434 S.W.3d at 381.

> The Indian Child Welfare Act, 25 U.S.C. § 1912(f), provides in pertinent part that
>
> [n]o termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony by qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

Thus, in this case it must also be shown by proof beyond a reasonable doubt that continued custody with the Newmans is likely to result in serious emotional or physical damage to their child. *Burks v. Ark. Dep't of Human Servs.*, 76 Ark. App. 71, 76, 61 S.W.3d 184, 187 (2001).

DHS met its burden under section 1912(f). In its termination order, the trial court stated that DHS had proved its case "beyond a reasonable doubt." Moreover, the court found that the Cherokee Nation tribe representative testified that continued custody by the Newmans would result in serious physical or emotional harm to C.N. and that DHS made active efforts to provide remedial services and rehabilitative programs to prevent the breakup of the Indian family.

We note that the Newmans' challenge to the sufficiency of the evidence seeks to have our court reweigh the evidence. They contend that they did assume responsibility for C.N.'s injury, that not all of their encounters with law enforcement resulted in arrests or convictions, that the Taser video showed that Brent did not attempt to interfere with the officer, that the findings of violence were based on outdated information, that the drug-test results established that the Newmans had not used drugs since October 2014, and that their counselor opined that they had made progress. However, we cannot reweigh the evidence. Credibility determinations are left to the trial court. *Ford*, 2014 Ark. App. 226, at 2, 434 S.W.3d at 381. For all of these reasons, we hold that the trial court did not clearly err in terminating the Newmans' parental rights to C.N.

For their final argument, the Newmans contend that the trial court abused its discretion in denying their motion to set aside the termination order under Arkansas Rules of Civil Procedure 59, or alternatively, for a new trial under Rule 60. Their motion was based on the trial court's failure to enter a timely termination order as required by Arkansas Code Annotated section 9-27-341(e), which provides that "[a] written order shall be filed by the court . . . within thirty (30) days of the date of the termination hearing . . . ." There is no dispute that the termination order was not filed within thirty days of the termination hearing. The Newmans contend that the delay constituted either an irregularity in the proceedings that prevented them from receiving a fair trial or a miscarriage of justice.

We review the denial of motions to set aside judgments pursuant to Rule 59 and motions for new trial pursuant to Rule 60 under an abuse-of-discretion standard. *Jones v. Double "D" Properties, Inc.*, 352 Ark. 39, 48, 98 S.W.3d 405, 410 (2003) (Rule 60 standard of review);

*Nobles v. Tumey*, 2010 Ark. App. 731, at 12, 379 S.W.3d 639, 647–48 (Rule 59 standard of review).

The record reveals no explanation for the five-month delay between the oral decision handed down at the termination hearing and the trial court's entry of the termination order. The violation of the time constraint set forth in section 9-27-341(e) is, arguably, an irregularity in the proceeding. And clearly, the best practice would have been for the trial court to timely enter its termination decision.

Nevertheless, there is no evidence in this case that the trial court's failure to timely file the termination order had the effect of making the termination proceeding unfair or that it constituted a miscarriage of justice. The timing of the filing of the termination order had no effect on the termination proceeding whatsoever. The Newmans received a fair opportunity to litigate their substantial rights. And the Newmans failed to present any evidence that in the five months following the termination hearing they improved their positions in regard to the case plan. To the contrary, the only evidence in the record of the Newmans' posthearing status was that they had regressed—Brent assaulted and battered Brooke again, he was incarcerated, and she was unemployed. Accordingly, we hold that the trial court did not abuse its discretion in denying the Newmans' motion to set aside the termination order or for new trial.

Affirmed.

ABRAMSON and GRUBER, JJ., agree.

*Depper Legal Services, PLC*, by: *Robert L. Depper III*, for appellants.

*Jerald A. Sharum*, County Legal Operations, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor child.