SLIP OPINION

Cite as 2016 Ark. App. 420

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CV–16–399

| | |
|---|---|
| SABRINA HAMILTON<br>APPELLANT | **Opinion Delivered:** September 21, 2016 |
| V. | APPEAL FROM THE WASHINGTON<br>COUNTY CIRCUIT COURT<br>[NO. 72JV-2014-223] |
| ARKANSAS DEPARTMENT OF<br>HUMAN SERVICES and MINOR<br>CHILDREN<br>APPELLEES | HONORABLE STACEY<br>ZIMMERMAN, JUDGE<br><br>AFFIRMED |

## RITA W. GRUBER, Judge

Sabrina Hamilton appeals the October 8, 2015 order of the Circuit Court of Washington County that terminated her parental rights and the parental rights of Justin Jackson to K.J. (born on March 4, 2011), B.H.1 (born on January 7, 2013), and B.H.2 (born on February 13, 2014). She challenges the circuit court's findings that the Arkansas Department of Human Services (DHS) had proved that the children would be subject to potential harm if returned to her custody and that there were statutory grounds on which to base termination. Jackson is not a party to this appeal.

In ordering that parental rights be terminated, the trial court must make two findings by clear and convincing evidence: at least one statutory ground must exist, and termination must be in the child's best interest. Ark. Code Ann. § 9–27–341(b)(3) (Repl. 2015). In making a "best interest" determination, the trial court must consider two factors: the

SLIP OPINION

likelihood that the child will be adopted and the potential harm to the child if custody is returned to a parent. Ark. Code Ann. § 9-27-341(b)(3)(A). Clear and convincing evidence is such a degree of proof that produces in the fact-finder a firm conviction regarding the allegation to be established. *Harbin v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 715, 451 S.W.3d 231. Our review of a termination of parental rights is de novo. *Id.* Our inquiry is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous; credibility determinations are left to the fact-finder. *Id.*

On April 1, 2014, DHS exercised an emergency 72-hour hold on 3-year-old K.J., 15-month-old B.H.1, and 2-month-old B.H.2 to protect them from harm. The hold was based on DHS's determination that the juveniles were in imminent danger due to Hamilton's exhibiting belligerent, aggressive, argumentative behavior; being under the influence of methamphetamine; and being the children's only primary custodian. On April 4, 2014, DHS filed a petition for emergency custody and dependency-neglect, accompanied by the affidavit of family-services worker Evelyn Ponce setting forth the following events that occurred on April 1 when she went on an investigation and located Hamilton. Hamilton appeared nervous, her hands were "a little shaky," and she "turn[ed] her head constantly in a jerky way when speaking." When Ponce asked her to undergo a drug screen, she refused and became hostile. Jackson was incarcerated at the time. Ponce telephoned her supervisor and was told to take a hold on the three juveniles. Ponce instructed Hamilton to get the children ready. Hamilton began cussing, then agreed to do the drug test, but would not follow through when she was informed that Ponce would need to be present in the restroom. Hamilton again

SLIP OPINION

began cussing and became hostile, so Ponce telephoned the police. Hamilton admitted that her test would be positive for methamphetamine and marijuana. Later, at the DHS office, she agreed to be tested; the results were positive for methamphetamine, amphetamine, and cannabinoids. On April 4, 2014, the court entered an ex parte order for emergency custody of K.J., B.H.1, and B.H.2.

In an April 10, 2014 probable-cause order, the circuit court found probable cause that the emergency conditions necessitating the children's removal from the parents' custody continued and that it was contrary to their welfare to be in Hamilton's custody due to her "unaddressed substance abuse issues." The order required, in part, that she cooperate with DHS, participate in individual counseling, not use illegal drugs or alcohol, have a drug-and-alcohol assessment and follow recommendations, submit to random drug screens, obtain and maintain stable housing and employment, and follow the case plan and court orders. B.H.2 was to remain in DHS custody and in his separate foster home; K.J. was to begin play therapy; K.J. and B.H.1 were to be placed with their maternal grandmother, Kathleen Standley, subject to a home study, and—while placed there—Hamilton was to have visitation with K.J. and B.H.1, supervised by Standley.

In a June 9, 2014 adjudication order, the court found that the juveniles were dependent-neglected and at substantial risk of serious harm due to parental unfitness, specifically because of Hamilton's erratic behavior and positive drug tests on April 1 and because B.H.2 had been malnourished. Hamilton was ordered to cooperate with DHS, participate in individual counseling within 30 days, not use illegal drugs or alcohol, submit to

3

drug screens at least bi-weekly, complete 12 hours of parenting classes within 2 months, obtain and maintain stable housing and employment, and follow the case plan and court orders. B.H.2 was to remain in DHS custody, and K.J. and B.H.1 were provisionally placed with Grandmother Standley. The goal of the case was set as reunification with Hamilton.

In a review order of October 8, 2014, Hamilton was found to be in partial compliance with court orders and the case plan. The juveniles had been removed from provisional custody with Standley and were to remain in DHS custody.[1] Returning them to Hamilton's custody was found to be contrary to their welfare because her progress was insufficient: she had not yet demonstrated stability or an ability to protect the three juveniles and keep them safe from harm. She had not maintained stable housing, had not "participated in random drug screens as requested," had violated a court order by having unsupervised contact with her children, and had not completed inpatient drug treatment as recommended. She had maintained stable employment, had participated in counseling, and had completed the parenting classes. The goal remained reunification.

In a permanency-planning order of February 25, 2015, the court ordered that the children remain in DHS custody. The court changed the goal of the case from reunification to adoption and authorized the filing of a petition for termination of parental rights. The court found that Hamilton had not complied with all court orders and the case plan. She had recently been arrested. She had maintained stable housing and employment, had participated

---

[1]In September 2014, K.J. and B.H.1. were removed from Standley's home because her home was "infested with roaches" and she was allowing Hamilton to have unsupervised visits with the children—a violation of court orders.

in counseling, had completed a 6-month hair-follicle test with negative results, had not "participated in all requested drug screens," and had not "completed inpatient drug treatment." She had attended visits and submitted to a psychological evaluation, but she had not followed recommendations of the evaluation and had not addressed her substance-abuse and mental-health issues.

A review hearing was conducted in August 2015. In its review order of August 31, 2015, the court noted that the attorney ad litem had withdrawn her petition for termination. The court noted that Jackson had recently been released from prison and found that the parents had not made sufficient progress. The court found it appropriate to begin supervised in-home visits with Hamilton and Jackson; however, the visits would move to the DHS office "if [K.J.] has increased anxiety or negative reaction to visits being in the home." The court found that Hamilton was not in compliance with "most" of the court orders and case plan:

> [S]he has not submitted to weekly random drug screens; she has changed jobs. She has maintained housing with her mother; she completed parenting classes; she has completed counseling; she obtained a private hair follicle test, which was negative. [K.J.] has special needs & anxiety & has diarrhea after visits with Mom—reacting negatively to visits with Mom.
>
> . . . .
>
> Mom cannot meet the needs of all of her 4 children. (Newborn . . . born 5/27/2015) lives with Mom.)

The goal of the case remained adoption of K.J., B.H.1, and B.H.2.

A second permanency-planning hearing was conducted in September 2015. In its September 24, 2015 order, the court found that Hamilton had not complied with court orders and the case plan in the following ways:

SLIP OPINION

Mother has not submitted to random drug screens as ordered. Mother failed a drug screen for THC in 2015. This positive drug screen has been sent for confirmation. The lab reported evidence that the urine specimen had been adulterated. THC was not found. Mother has not demonstrated an ability to protect her children and keep them safe from harm. Mother has not demonstrated an ability to meet the needs of her four (4) children, as the three children named in this foster care case have special needs. [K.J.] reacts negatively to visits with Mother.

Again, the goal of the case remained adoption of K.J., B.H.1, and B.H.2.

On October 8, 2015, DHS filed its petition for termination of parental rights, stating that termination was in the best interest of K.J., B.H.1, and B.H.2, and setting forth three statutory grounds for termination:

(i)(*a*) That the juveniles have been adjudicated by the court to be dependent–neglected by the Court on June 5, 2014 and have continued out of the custody of the parents for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parents and correct the conditions that caused removal, those conditions have not been remedied by the parents (*see* A.C.A. § 9-27-341(b)(3)(B)(i)(*a*)),

(ii)(*a*) The juveniles have lived outside the home of the parents for a period of twelve (12) months, and the parent has willfully failed to . . . maintain meaningful contact with the juveniles (*see* A.C.A. § 9-27-341(b)(3)(B)(ii)(*a*)),

(vii)(*a*) That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juveniles in the custody of the parent is contrary to the juveniles' health, safety, or welfare and that, despite the offer of appropriate family services, the parents have manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parents' circumstances which prevent the placement of the juvenile in the custody of the parents (*see* A.C.A. § 9-27-341(b)(3)(B)(vii)(*a*)).

*See* Ark. Code Ann. § 9-27-341(b)(3)(B) (Repl. 2015).

In a written order of November 24, 2015, the court suspended the visitation of both parents. The court noted that it had "consistently had concerns for the well-being and emotional and physical health of [K.J.] during the life of this case."

The termination hearing was held on January 27, 2016, when K.J. was nearly five, B.H.1 was three, and B.H.2 was almost two. The court granted the petition to terminate at the hearing's conclusion, finding by clear and convincing evidence that termination was in the juveniles' best interest and that DHS had proved the three statutory grounds alleged in its petition. The court stated in its written order that, in determining best interest, the court had specifically considered both the likelihood that the juveniles would be adopted and the potential harm to their health and safety if they were returned to their parents' custody. Hamilton challenges the finding of potential harm and the existence of the three statutory grounds.

*I. Potential Harm*

Hamilton first addresses the opinion of family services worker Haley Carson that Hamilton could not meet the three juveniles' "special needs" and that none of the three juveniles could be safely returned to her. She disputes three factors to which Carson testified: emotional harm and inability to meet the children's special needs, drug use, and missed visitations and Hamilton's arrest.

Hamilton contends that the children had no "special needs" for her to meet. She points to testimony by B.H.2's pediatrician that early feeding issues after B.H.2's birth had been resolved and to the preschool director's testimony that B.H.1's speech issues from the time he had entered foster care subsequently improved to the point that he was 99 percent understandable. Hamilton concedes that K.J. initially struggled emotionally with her foster–care placement and her relationship with Hamilton and that K.J. had anger outbursts, anxiety,

SLIP OPINION

and sleeping issues after visits with her "for a long time." She points to testimony by K.J. and B.H.1's foster mother that K.J.'s issues eventually lessened; that things fell apart a year into the case when the court ordered visits with Jackson; and that K.J. and B.H.1 experienced regression issues after their only in-home visit with Jackson present—necessitating an emergency call to the therapist. Hamilton asserts that K.J.'s "special need" was clearly agitated by contact with Jackson rather than Hamilton and that DHS's approach, which simply ended Hamilton's visits without addressing K.J.'s need through therapeutic sessions, was counterproductive to reunification.

Hamilton also asserts that the record does not indicate that she used drugs since at least August 2014, 17 months before the termination hearing. She points to her challenge of the positive marijuana test results, found to have been adulterated; to negative results of her two hair-follicle tests—one ordered by DHS and a private test that she obtained; to her progress in housing, employment, parenting, and counseling; and to her testimony that she never "flat-out refused" to take drug tests and could not risk losing her job in an effort to comply with test times.

Finally, Hamilton disagrees that her missed visitations and arrest constituted a factor of potential harm and risk to the juveniles. Acknowledging Carson's testimony of nine missed visits between November 2015 and January 2016, Hamilton points to her own testimony that she had undergone surgery and that she and the baby had been sick for several months before the January hearing. Regarding her arrest, she notes her testimony that she was detained for failure to appear on an underlying charge of no seatbelt and failure to register her vehicle, that

she was detained for only two hours, that her youngest child was with her at the time, and that she took care of the arrest issue after arranging for her mother to provide childcare.

DHS responds that the finding of potential harm is not clearly erroneous for the following reasons. First, Hamilton failed to comply with court orders by not undergoing drug screens as scheduled. She claimed that she could not come in for testing because of work, but only once took advantage of Carson's offer to reschedule. Hamilton was a no-show for about 70 percent of her drug screens—with 100 percent missed in the 5 months preceding the January 2016 termination hearing—and her second hair-follicle test—the private one—had been in August 2015. Second, Hamilton never obtained stable housing; rather, she chose to live with her mother—where provisional placement had failed. Third, the testimony of K.J.'s therapist, Tammy Pearson; psychiatric nurse practitioner Jennifer Penny; and Maria Johnson, K.J. and B.H.1's foster mother of 16 months, specifically showed a lack of bond between Hamilton and K.J.

DHS notes testimony pertinent to the finding of potential harm. Pearson stated that K.J. rarely mentioned her mother but that when Pearson would bring up the subject, "K.J. will almost immediately become very flat or have a frown on her face. She'll rub between her eyes as if she has a headache . . . very frequently grab her stomach and say she has a stomachache." Penny testified that during discussions about Hamilton, K.J. would have physical complaints such as stomachache, would appear to be fearful and less secure—looking around the room and darting her eyes. Johnson testified to the following:

> [D]uring the life of this case, I did have concerns for K.J. surrounding her visits with
> her parents or with her mom. Those concerns were anxiety issues, which at the time

I didn't realize were—that it was anxiety, the stomachaches, and became aware of an increase of attention-getting things. She said a lot of—which were strange to me, "My bottom hurts." She would come up with these crazy different ideas of attention-getting things, wanting me, you know, just wanting me to nurture her, hold her, not wanting to go to sleep, and especially after visits. There wasn't ever a lot of discussion before visits. She's never really asked, she's never cried . . . asked for [Hamilton], wanted to go home, but after a visit, when I would take note, there didn't seem to be a big display, but then afterward or following, . . . much increased . . . anxiety, outburst behavior, tantrums, sleep issues.

In determining potential harm, which is forward-looking, the court may consider past behavior as a predictor of likely potential harm should the child be returned to the parent's care and custody. *Dowdy v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 180, 314 S.W.3d 722. There is no requirement that every factor be established by clear and convincing evidence; after consideration of all factors, the evidence must be clear and convincing that termination is in the best interest of the child. *Harbin*, 2014 Ark. App. 715, at 3, 451 S.W.3d at 233. Parental rights should not be allowed to continue to the detriment of the child's welfare and best interest. *See J.T. v. Ark. Dep't of Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997). The appellate court gives a high degree of deference to the trial court, which is in a far superior position to observe the parties before it. *Taffner v. Ark. Dep't of Human Servs.*, 2016 Ark. 231, at 6, ___ S.W.3d ___, ___.

The circuit court noted in its order of termination that the juveniles had been in foster care for 668 days; had been traumatized when they were initially removed from their home and again, as to K.J. and B.H.1 when they were removed from the provisional foster home of their grandmother due to a roach infestation; and that all three juveniles had made "huge progress" in foster care. The court further found,

SLIP OPINION

that Mother cannot meet the special needs of all four (4) of her children and that although mother is adequately caring for her new baby, . . . that Mother cannot meet the needs of her other three (3) children and that the issues which caused these three (3) children to come into foster care have not been remedied. Throughout this case, the Mother has never once been in full compliance with the case plan and court orders. The children need stability, structure, and permanency; Mother cannot meet these needs.

We hold that the circuit court did not clearly err in finding that K.J., B.H.2, and B.H.1 would be subject to potential harm if returned to Hamilton's custody.

## II. Statutory Grounds

We note that only one statutory ground in section 9–27–341(b)(3)(B) need be proved to support termination. *Sims v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 137, at 7. We affirm under the first ground found by the circuit court, the failure to remedy conditions that caused removal.

Hamilton argues that the initial cause of removal was severe drug use, but there was "no evidence" of a remaining drug issue and DHS felt that she could keep her youngest child in the home. We have previously discussed her nearly identical arguments in the potential-harm section of our opinion. We also note that, in determining that Hamilton failed to remedy conditions which caused removal, the circuit court found that she was not in full compliance with the case plan and court orders:

Hamilton still has not submitted to random weekly drug screens (having missed ALL her drug screens (19) since the last hearing). The Court also finds that [she] has missed nine (9) of her scheduled visits since September of 2015. The Court finds that the root cause of this case still has not been remedied by the Mother.

We hold that the circuit court did not clearly err in terminating Hamilton's parental rights under the failure-to-remedy ground.

Were we to address the court's finding of the subsequent-factors ground, we would hold that the circuit court did not clearly err. *See Cotton v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 455, at 11, 422 S.W.3d 130, 138 (holding that a lack of compliance with the case plan and court orders supported termination under this ground).

Affirmed.

WHITEAKER and HOOFMAN, JJ., agree.

*Leah Lanford*, Ark. Pub. Defender Comm'n, for appellant.

*Andrew Firth*, County Legal Operations, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor children.