

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-17-328

| | |
|---|---|
| MAX MCKINNEY, SR.<br>APPELLANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN<br>APPELLEES | **Opinion Delivered:** September 20, 2017<br><br>APPEAL FROM THE CRAIGHEAD COUNTY CIRCUIT COURT, WESTERN DIVISION<br>[NO. 16JV-15-410]<br><br>HONORABLE CINDY THYER, JUDGE<br><br>AFFIRMED |

## WAYMOND M. BROWN, Judge

Appellant appeals from the circuit court's termination of his parental rights to B.M., born 2/18/02; and A.M., born 10/5/12, in its January 25, 2017 order.[1] Because the circuit court's findings supporting termination are not clearly erroneous, we affirm.

### I. *Facts*

An emergency hold was taken on B.M. and A.M. on November 10, 2015, by order of the circuit court, due to allegations involving inadequate supervision due to drug use by

---

[1]The parental rights of the children's mother, Natasha Furnish, were terminated separately in an order entered on November 8, 2016. Her appeal to this court was affirmed in *Furnish v. Arkansas Department of Human Services*, 2017 Ark. App. 278, *vacated*, 2017 Ark. 240 (ordering this court to enter a full opinion pursuant to *Brookshire Grocery Co. v. Morgan*, 2017 Ark. 221 (per curiam) (overruling *In re Memorandum Opinions*, 16 Ark. App. 301, 700 S.W.2d 63 (1985) (per curiam))).

the children's mother, Natasha Furnish, and appellant.[2] Appellant tested positive for methamphetamine.

Appellee Department of Human Services (DHS) filed a petition for emergency custody and dependency-neglect on November 15, 2015. The circuit court entered an ex parte order for emergency custody on the same date. A probable-cause order was entered on November 16, 2015, in which the circuit court found that there was probable cause that emergency conditions existed which necessitated removal of the children from the "custody of their mother" and continued to exist, thereby necessitating that the children remain in the custody of DHS. It found appellant to be the legal and biological father of B.M. and A.M. Appellant was ordered to comply with a list of standard orders.

The children were adjudicated dependent-neglected on account of "[p]arental unfitness due to drug use of the mother" in the circuit court's adjudication order entered on December 11, 2015. However, the circuit court found that appellant "did contribute to the dependency-neglect of the herein juvenile, [sic] specifically, [he] tested positive for Methamphetamine[,]" that appellant was not a fit parent for purposes of custody, and that the children could not be safely placed with appellant. It explicitly stated that appellant must follow the case plan and court orders. The goal of the case was reunification with a concurrent plan of relative placement, permanency, and adoption.

---

[2]Two siblings of B.M. and A.M.—R.M., born 5/24/98, and C.M., born 7/20/15—were removed pursuant to the same order. R.M. reached the age of majority and appellant was found not to be the father of C.M.; accordingly, he does not seek custody of either in this appeal. Another child—M.M., born 9/8/16—was taken into custody on September 8, 2016, pursuant to the circuit court's ex parte order following a petition for emergency custody and dependency-neglect from DHS. The matter of M.M. is not before this court.

A review order was entered on May 6, 2016, in which the circuit court stated that appellant had participated in the case by visiting the children on a regular basis, submitting to random drug screens, submitting to a drug-and-alcohol assessment, and by "very partial" [sic] cooperating with DHS and complying with the case and all court orders. It also stated that appellant had not participated in and completed parenting classes; remained drug free, testing positive most recently for THC on March 23, 2016; obtained and maintained clean, safe, and stable housing, with utilities turned on; obtained and maintained stable employment; or prepared and submitted a budget indicating sufficient income. Finally, it stated that appellant had started "the 12-out-patient drug sessions, completing 4 so far" while noting that appellant "needs to consider whether outpatient is sufficient or whether [he] needs more treatment."

A review hearing was held on July 27, 2016; appellant did not appear. A review order was entered on July 28, 2016, in which the circuit court stated that appellant had only participated in the case plan by viewing "The Clock is Ticking" video and submitting to a drug-and-alcohol assessment. It found that appellant had not participated in the case with regard to any of its other orders, specifically noting that appellant stated he had taken methamphetamine on July 8, 2016; appellant had been incarcerated from May to July 2016, with an arrest warrant for him in Cleburne County; and appellant had had "[n]o contact since July 8, 2016." In each review order, the circuit court found that DHS had made reasonable efforts to provide family services and the case plan remained the same.

DHS filed its petition for termination of appellant's parental rights on September 9, 2016. It alleged that termination of appellant's parental rights was in the children's best

interest, taking into consideration the likelihood that the they would be adopted if the termination petition was granted and that there was the potential harm to their health and safety caused by returning them to the custody of the appellant.[3] DHS alleged the following grounds against appellant pursuant to Arkansas Code Annotated section 9-27-341:

1. That appellant had abandoned the children, specifically noting that appellant had failed to visit them since June 2016, had several active warrants for his arrest, and had several criminal charges;[4] and

2. That, subsequent to the filing of the original petition for dependency-neglect, other factors or issues arose that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent the placement of the juvenile in the custody of the parent, specifically noting that appellant did not compete rehab, was still using illegal drugs, and had several active criminal warrants and charges, including an assault on a woman at St. Bernards Hospital.[5]

A hearing on DHS's termination petition was held on January 5 and 12, 2017. Appellant was initially in court, according to his attorney, but he left and did not return. At the beginning of the hearing, appellant's attorney argued that a permanency-planning hearing should be held before a termination-of-parental-rights (TPR) hearing on DHS's petition. Given that B.M. had been placed with a married, paternal aunt in North Dakota, appellant moved that the home study of the aunt be considered for placement of A.M.[6]

---

[3]Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii) (Repl. 2015).

[4]Ark. Code Ann. § 9-27-341(b)(3)(B)(iv).

[5]Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(*a*).

[6]Appellant failed to notice a hearing or request a special hearing on his "Motion for Considered Placement." Appellant's motion was made orally on the day of the hearing.

Noting that Arkansas Code Annotated section 9-27-341(b)(1)(B) states that a permanency-planning hearing is not a prerequisite to filing a TPR petition or to a circuit court hearing the same, the circuit court found that it "[did] not believe that there had been an error or a significant omission in not having a Permanency Planning Hearing because the Department was entitled to file a Petition for Termination of Parental Rights according to that Statute without a Permanency Planning Hearing having been held." Finding it to be "premature for the Court to consider a hearing about the placement of the children when the Court has not decided as to whether Mr. McKinney does or does not have parental rights to these children intact[,]" the circuit court found it appropriate to proceed with the TPR hearing, which followed immediately thereafter.

Tina Green, foster-care worker and the latest caseworker assigned to the case,[7] testified that appellant missed his initial drug-and-alcohol assessment, though he completed the rescheduled assessment. He was recommended for outpatient treatment but failed to complete treatment; he was discharged for noncompliance after four sessions. He eventually completed another drug-and-alcohol assessment on December 30, 2016, which recommended a 21-day inpatient program. He was currently in an inpatient rehab as of January 3, 2017, which he was scheduled to complete on or around January 24, 2017; he had left another rehab—Project New Start—voluntarily on November 21, 2016.

Green testified that there were periods where appellant was not in contact with DHS, leaving it with no ability to drug screen him. The longest period was approximately seven

---

[7]There were at least three caseworkers assigned throughout the duration of the case.

months, during which DHS had only two drug screens for appellant, the latest being on January 3, 2017, when he tested positive for "methamphetamine, MPA, and oxy." Green did not believe appellant's drug issue had been "rectified satisfactorily." She opined that "at least six months of some sort of sobriety" would have been helpful; "a minimum of three" months.

Green testified that appellant did not have stable housing, as he was living with relatives in Mississippi, and she had not been able to check the home for appropriateness. Appellant never asked for services to be provided in Mississippi, stating that he was willing to travel to Jonesboro to complete the services if DHS set them up; he did not tell her that he was completing parenting classes or any other services in Mississippi. Green had provided appellant with the information for parenting classes, but he had not provided proof of completion. Appellant had provided no proof of employment or income, and though he had been complying with visitation, it had not been consistent due to his different rehab entries and periods of incarceration.

Appellant had told Green that he and Furnish were still married and living together in December 2016; appellant had not told her that their relationship status had changed. Appellant brought Furnish to his January 3, 2017 visit with the children though she remained in the car; Green saw that as evidence that the two "remained together."[8] Green had concerns with appellant's continued relationship with Furnish, whom she described as unstable as well because "she had admitted out of her own mouth" that she still had current

---

[8]Green acknowledged that while appellant was currently in inpatient rehab at NEARCC in Jonesboro, Furnish was in rehab at the Quapaw House in Hot Springs.

drug-use issues, and the circuit court had terminated her parental rights to the children, a decision after which appellant married her.

Green believed termination to be in the children's best interest based upon appellant's "instability, the current drug use"; his lack of proof of income; his noncompliance with court orders; and his lack of adequate housing. She believed the above-referenced factors posed a danger to the children and believed the children were adoptable—even if there were currently no families interested—though she testified that there were currently families interested in adopting the children.

Gretchen Lackey, the caseworker immediately preceding Green from March 2016, testified by phone.[9] She stated that appellant had at least three visits prior to being arrested on May 24, 2016, and that she received a certified letter that appellant had gone to rehab in North Dakota. She had a meeting with appellant, while visiting Furnish who was pregnant at the time, but did not have a drug screen during that meeting because appellant stated he would fail for methamphetamine.[10] She had no direct contact with appellant from that conversation until she left on September 23, 2016, and he had no visits with the children between his May 24, 2016 arrest and when she left. She also stated that appellant had been made aware of parenting classes as of the July 27, 2016 order, which stated that he had not completed classes, but he was not in contact with her "at one point" in the case, so she did not know if he completed parenting classes.

---

[9]Lackey had left the employ of DHS.

[10]No date was given for this meeting, only that it was after appellant's arrest on May 24, 2016.

Where not duplicative of other testimony, appellant testified that he owed about $4,000 total in fines between Cleburne and Craighead Counties and had payment arrangements on both fines, neither of which was in good standing. He said he went to rehab in North Dakota on July 19, 2016, and returned on August 23, 2016, when he left rehab after M.M. was born prematurely. He asserted that he had been in Arkansas since M.M.'s birth, though he later testified that he was in Mississippi between August 24, 2016, and September 14, 2016. When he returned to Arkansas, he started the Project New Start rehab, but quit at the end of November because he alleged that they had him working without providing any services; he has been in Mississippi since he quit Project New Start and considers it home. He planned to complete a 12-week outpatient program after his current program. He claimed to have participated in parenting classes, but admitted that he had provided no proof to DHS.

Appellant testified to being incarcerated for two days in April 2016; from May 24, 2016, to June 29, 2016; and from September 14, 2016, to October 14, 2016. He denied having any arrests or having returned to jail since his October 14, 2016 release. He currently had arrest warrants and had been told to turn himself in when he completed rehab; he did not turn himself in between leaving rehab in November and starting a new program in January because he had not completed rehab.

Appellant asserted that he was last employed two weeks prior to the hearing, working for his father-in-law; he admitted providing no proof of employment. Though he worked for one month, he did not use any of the income to pay his fines. He asserted that he used

some of the money toward rehab, though he admitted that he did not have to pay for the rehab he was currently in.

Appellant asserted that "the problem that [he'd] had since this case began [had] been [his] drug use" and he "[hadn't] been able to get that under control." He missed visitation between May 24, 2016, and September 2016 not "for no reason" as he wanted to visit his children, but because "[i]t was just the situations [he] got [himself] in prohibited that."

Regarding his October 24, 2016, post-termination-of-her-rights marriage to Furnish, appellant stated that Project New Start was the only program—a six-month inpatient program—that would accept him without insurance, but he could not go there while Furnish was a patient unless they were married, so he married her. He admitted that he was not asking the court to place the children with him at that time as he wanted to complete rehab since he had "never had the tools to utilize to be able to stay sober[.]" He was asking the court to place the children with his sister. He felt like "six months would be a good time" for him to get it together. Appellant admitted that he had had a drug problem for fifteen years. When asked what efforts he had taken to enter a rehab or some sort of counseling, appellant maintained that he had had a "three-and-a-half-years sobriety" from 2008 to 2010 when he worked for a fire department. He went on to maintain that he did not start back using until 2012 and admitted that he did not seek rehab or try to maintain his sobriety; he "didn't realize that [he] had a problem" because he was able to provide for his children, kept a job, and took care of his "everyday responsibilities."

The court bailiff then testified to contacting dispatch and learning that appellant had four failure-to-appear warrants and three contempt-of-court warrants in Jonesboro. He and

a warrants officer from the Jonesboro Police Department discussed appellant's situation with appellant. The officer told appellant to contact him after he finished rehab on January 23, 2017.[11]

Following the bailiff's testimony, appellant moved to dismiss the petition due to lack of sufficiency of evidence to support either ground asserted by DHS. The circuit court granted the motion on the abandonment ground, noting that the appellant had visited the children since the petition, as testified to by Green. The motion was denied as to the other subsequent-factors ground.

Appellant's sister, Jennifer Alber, testified by phone to having B.M., who had no concerns that she knew of, and wanting A.M. From February 2015 to July 2015 when appellant was incarcerated and Furnish was not allowed to have the children in her care, B.M. and A.M. had lived with Alber under a guardianship. Her guardianship ended right after appellant got out of jail. She asserted that she had talked to DHS "for over a year" about getting custody of the children, but there were three different caseworkers. If she received custody, as far as their interaction with appellant, she "will do whatever the Court asks [her] to do." She was willing to follow any safety plan put in place regarding B.M. She stated that appellant had "always had an issue on and off" with drugs, but it was not her understanding when she got the guardianship that Furnish had an issue with drugs.

Additionally, the circuit court sought testimony regarding a delinquency charge against B.M., which was implicitly spoken about. Testimony revealed that the charge was

---

[11]This was in response to appellant's advisement that he would be kicked out of rehab and have to start over if he turned himself in on his warrants.

unsubstantiated and converted to a FINS petition, but B.M. was required to go through sex-offender-specific counseling. The allegation arose after the children entered care; A.M. was the alleged victim. Alber testified she did not know about the court-ordered therapy and so B.M. had not completed it. B.M.'s counsel, Ms. Jones,[12] testified that this deal was made to keep B.M. from being labeled as a sex offender, thereby limiting their options for placement. Accordingly, B.M. does not have a delinquency finding against her. Jones could not recall if there were any restrictions on B.M.'s being placed with younger children.[13] But given that B.M. had not undergone the court-ordered therapy, Jones admitted that it would cause her concern about placing B.M. in a home with other younger children, particularly the alleged victim in the matter. Jones advised that the reason for placing B.M. in the therapy was to have a professional weigh in on the risk and on whether any restrictions need to be placed on B.M.[14]

Appellant then renewed his motion to dismiss; it was denied. The ad litem then recommended that appellant's rights to the children be terminated. The circuit court orally granted DHS's petition and made a number of findings, specifically noting with regard to the other-subsequent-factors ground, the following:

> I want to point out that Mr. McKinney has an ongoing drug issue that although was not a basis for a specific dependency-neglect finding in the Adjudication Order, it was recognized in the Adjudication Hearing that he had tested positive for

---

[12]B.M.'s counsel was identified only as Ms. Jones; no first name was given. She happened to be in court for another matter.

[13]There was sufficient evidence to move forward on a delinquency finding, but Ms. Jones "begged" the juvenile department not to do so, and they did not.

[14]Alber had two sons in her home, 11 and 16 years, at the time of the hearing. She also has a four-month-old granddaughter.

methamphetamines. The Court finds that there's a difference between a positive test for methamphetamines and an ongoing issue. I think as this case has progressed the extent of Mr. McKinney's drug use has become better known. Also, after the initial Petition in this case was filed, Mr. McKinney had ongoing legal issues which manifested itself with an arrest in April for a couple of days incarceration. There was an incarceration in May and June, 2016, and another incarceration in the fall.

It also stated, referring to the implication that the children could be cared for long-term by

Alber, that:

> The paternal aunt to these children has had one of the children, B.M., for one month. There has been reference to a home study that I have not seen. There is no indication by this aunt that she would be willing to adopt the children and we know how important that permanency is. It would be speculative for me to assume so. I gather from the responses to the questions of the aunt that she is not aware of the issues that not only could impact B.M. if her siblings were placed there and impact those siblings, but it could also impact the safety and the wellbeing of the aunt's own children. My fear is that there has been insufficient discussion for her to even know what those issues are. I am deeply troubled by the representation that a delinquency adjudication was avoided in order to facilitate the placement of a teenage child with a family member and also that sex-offender specific treatment would not have been ordered for B.M. unless it was needed. Not only must this Court consider the safety of the potential offending child but also the safety of other children as well.

> Going forward, all of these issues must be fully explored with sufficient proof that meets best evidence standards, so that the Court is not considering long term placement of these children while blindfolded. I'm also directing the Department if the safety of young children is demonstrated to be an issue after a much more extensive development of these issues to discuss this case completely with a paternal aunt so she is aware and may make informed decisions about her future role, if any, in this case.

The circuit court entered an amended order terminating appellant's parental rights on

February 3, 2017, stating the following in support of the other-subsequent-factors ground:

> Following the dependency-neglect finding, the full extent of the father Max McKinney's drug issues were discovered. He did not complete rehab and is still using illegal drugs. He tested positive for methamphetamine on January 3, 2017. Mr. McKinney testified that he has not considered himself to be sober since 2011 when he was in prison. Mr. McKinney has ongoing legal issues. He was incarcerated in April 2016, had another arrest and incarceration in May-June 2016, and a subsequent arrest and incarceration in September-October 2016. He has unpaid fines of

approximately $2000 in each Craighead County and Cleburne County in Arkansas. There are also seven current arrest warrants out on him. During the periods when he was not in jail he did not take advantage of rehab services or visit with his children.

In addition, the mother, Natasha Furnish McKinney, had her parental rights to these juveniles terminated on October 11, 2016. Mr. McKinney has since married the mother; and is in an active relationship with her.[15]

In finding that the children were adoptable and that there was potential harm to the health and safety of the children if returned to appellant, the circuit specifically noted that it considered the testimony of Tina Green, which it found to be credible and demonstrative of the potential harm to the children if returned to appellant. This timely appeal followed.

## II.  *Standard of Review*

In ordering that parental rights be terminated, the circuit court must make two findings by clear and convincing evidence: at least one statutory ground must exist, and termination must be in the child's best interest.[16] In making a "best interest" determination, the circuit court must consider two factors: the likelihood that the child will be adopted and the potential harm to the child if custody is returned to a parent.[17] Clear and convincing evidence is such a degree of proof that produces in the fact-finder a firm conviction regarding the allegation to be established.[18] When the burden of proving a disputed fact is

---

[15]The original order terminating appellant's parental rights was entered on January 25, 2017.

[16]*Hamilton v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 420, at 1, 501 S.W.3d 406, 408 (citing Ark. Code Ann. § 9–27–341(b)(3) (Repl. 2015)).

[17]*Id.*, at 1–2, 501 S.W.3d at 408 (citing Ark. Code Ann. § 9–27–341(b)(3)(A)).

[18]*Id.*, at 2, 501 S.W.3d at 408 (citing *Harbin v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 715, 451 S.W.3d 231).

by clear and convincing evidence, the appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous.[19] A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made.[20] In resolving the clearly erroneous question, the reviewing court defers to the circuit court because of its superior opportunity to observe the parties and to judge the credibility of witnesses.[21] Our review of a termination of parental rights is de novo.[22]

### III.  Permanency-Planning Hearing

Appellant's first argument on appeal is that the circuit court's failure to hold a permanency-planning hearing is reversible error. Arkansas Code Annotated section 9-27-341 states that the circuit court "may consider a petition to terminate parental rights if the court finds that there is an appropriate permanency placement plan for the juvenile"[23] and that "[t]his section does not require that a permanency planning hearing be held as a prerequisite to the filing of a petition to terminate parental rights or as a prerequisite to the court's considering a petition to terminate parental rights."[24] Accordingly, appellant argues

---

[19]*Houseman v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 227, at 2, 491 S.W.3d 153, 155 (citing *Hughes v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 526, at 2).

[20]*Id.*, at 2–3, 491 S.W.3d at 155.

[21]*Id.* (citing *Brumley v. Ark. Dep't of Human Servs.*, 2015 Ark. 356, at 7; *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 213, 40 S.W.3d 286, 291 (2001)).

[22]*Hamilton*, 2016 Ark. App. 420, at 2, 501 S.W.3d at 408 (citing *Harbin*).

[23]Ark. Code Ann. § 9-27-341(b)(1)(A).

[24]Ark. Code Ann. § 9-27-341(b)(1)(A).

that "nowhere in § 9-27-341 does it indicate that the filing of the Petition for Termination tolls or eliminates the requirements for a Permanency Planning hearing." This court agrees.

Arkansas Code Annotated section 9-27-338 states that "[a] permanency planning hearing *shall* be held to finalize a permanency plan for the juvenile."[25] The use of the word "shall" in a statute means that the legislature intended mandatory compliance with the statute unless such an interpretation would lead to an absurdity.[26] While counsel for the minor children is correct that a TPR petition may be filed and considered prior to a permanency-planning hearing,[27] there is nothing in Arkansas Code Annotated sections 9-27-341 or 9-27-338 that permits the circuit court to abdicate its duty to hold a permanency-planning hearing altogether.

This court cannot agree with DHS's argument that the circuit court did not rule that it "did not have to hold a permanency hearing at all[,]" only that it "did not have to hold a permanency-planning hearing before terminating parental rights." By choosing to hold a TPR hearing before a permanency-planning hearing, the circuit court necessarily placed itself in a position of determining whether a permanency-planning hearing is required, contrary to the mandatory language of the statutes involved. This court agrees with appellant

---

[25]Ark. Code Ann. § 9-27-338(a)(1) (Repl. 2015) (emphasis added).

[26]*Walters v. Ark. Dep't of Human Servs.*, 77 Ark. App. 191, 195, 72 S.W.3d 533, 535 (2002) (citing *Ramirez v. White Cty. Circuit Court*, 343 Ark. 372, 38 S.W.3d 298 (2001)); *see K.D. v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 75, at 5, 454 S.W.3d 799, 802 ('In statutes, "shall" almost always means "must.'"")).

[27]*See* Ark. Code Ann. § 9-27-338(b)(A).

that the circuit court clearly erred in failing to hold a permanency-planning hearing. This court does not address whether the permanency-planning hearing must be held within twelve months because no permanency-planning hearing was held at all, thereby making the required timing irrelevant in this case.

Despite our agreement with appellant that the circuit court clearly erred in failing to hold a permanency-planning hearing, this court agrees with DHS that there is no express remedy for such a failure in the juvenile code. When the legislature has not seen fit to fashion a remedy, it is not the province of the court of appeals to do so. Termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents.[28] Parental rights, however, will not be enforced to the detriment or destruction of the health and well-being of the child.[29] The intent behind the termination-of-parental-rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective.[30] Termination cases are unique civil cases because time is viewed from the juvenile's perspective and the best interests of the children take precedence at every stage

---

[28] *Sanford v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 578, at 8, 474 S.W.3d 503, 508 (citing *Osborne v. Ark. Dep't of Human Servs.*, 98 Ark. App. 129, 133, 252 S.W.3d 138, 141 (2007)).

[29] *Id.*

[30] *Id.* (citing Ark. Code Ann. § 9-27-941(a)(3)).

of the proceedings.[31] To reverse and remand would be perfunctory in purpose, given the record before this court, and from a time perspective, would be contrary to the best interests of B.M. and A.M., who have already been out of the home for twenty-one months.

IV.  *Ground for Termination – Other Subsequent Factors*

Appellant's two-paragraph argument asserting that his drug use was not a subsequent factor is filled with conclusory statements and no legal analysis or authority. When a party cites no authority or convincing argument on an issue, and the result is not apparent without further research, the appellate court will not address the issue.[32] However, this court notes that while appellant is correct that his drug use is not a subsequent factor,[33] there was sufficient evidence of other subsequent factors that were unrelated to his drug use, including criminal charges, periods of incarceration, and marrying Furnish after her rights to the children had been terminated.

---

[31] *Burkett v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 570, at 5, 507 S.W.3d 530, 534 (citing Ark. Code Ann. § 9-27-341(a)(3) & Ark. Code Ann. § 9-27-102 (Repl. 2015)).

[32] *Todd v. Ark. Dep't of Human Servs.*, 85 Ark. App. 174, 185, 151 S.W.3d 315, 323 (2004) (citing *Webber v. Ark. Dep't of Human Servs.*, 334 Ark. 527, 975 S.W.2d 829 (1998); *Country Corner Food & Drug, Inc. v. First State Bank*, 332 Ark. 645, 966 S.W.2d 894 (1998)).

[33] *Bell v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 113, at 4, 484 S.W.3d 704, 707 (The "[subsequent factors ground] requires that subsequent issues arose after the original petition was filed, which demonstrate that it is contrary to the juvenile's health, safety, or welfare to place the juvenile with the parent.").

## V. *Best Interests*

Appellant alleges that the circuit court erred in finding that it was in the children's best interest to terminate his parental rights, arguing insufficient evidence of adoptability and potential harm. We disagree.

Adoptability is not an essential element but is rather a factor that the circuit court must consider.[34] The circuit court expressly found Green's testimony credible as to adoption. We have previously held that a caseworker's testimony that a child is adoptable is sufficient to support an adoptability finding.[35] Appellant argues that in *Greenhill v. Arkansas Department of Human Services*, "a challenge to adoptability was upheld by this court when the caseworker testified that she was hopeful that his most recent placement would become permanent, and she was unaware of any behaviors or issues that would keep [the child] from being adopted into the right home."[36] The argument is contrary to the outcome of *Greenhill* in which the adoptability finding was upheld on other evidence. Even then this court stated only that it "might agree" with appellant if that were the only evidence.[37]

---

[34]*Singleton v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 455, at 5, 468 S.W.3d 809, 812 (citing *Smith v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 430, at 4, 431 S.W.3d 364, 367).

[35]*Duckery v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 358, at 5–6 (citing *Hamman v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 295, 435 S.W.3d 495).

[36]2017 Ark. App. 194, 517 S.W.3d 473.

[37]*Greenhill*, 2017 Ark. App. 194, at 7, 517 S.W.3d at 478.

Potential harm to the child is a factor to be considered, but a specific potential harm does not have to be identified or proved by clear and convincing evidence.[38] The potential-harm analysis is to be conducted in broad terms.[39] It is the "best interest" finding that must be supported by clear and convincing evidence.[40] This court has consistently noted that continuing drug use demonstrates potential harm to children.[41] On January 3, 2017, two days prior to the scheduled termination hearing, appellant admitted and tested positive for using methamphetamine. And while appellant had been in therapy for two days at the time of the TPR hearing, he had a history of leaving rehab.[42] More importantly, it was not clear whether a 21-day, inpatient program was sufficient treatment given appellant's history. Additionally, appellant was in and out of jail between May 2016 and November 2016. A

---

[38]*Wilson v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 666, at 13, 476 S.W.3d 816, 824 (citing *Pine v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 781, at 11, 379 S.W.3d 703, 709).

[39]*Id.*

[40]*Id.* (citing *Schaible v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 541, at 9, 444 S.W.3d 366, 372).

[41]*Jackson v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 440, at 7, 503 S.W.3d 122, 126 (citing *Eldredge v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 385; *Davis v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 815, 370 S.W.3d 283; *Carroll v. Ark. Dep't of Human Servs.*, 85 Ark. App. 255, 148 S.W.3d 780 (2004)).

[42]*Whittiker v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 467, at 8, 469 S.W.3d 396, 401 (citing *Harbin*, 2014 Ark. App. 715, 451 S.W.3d 231; *Dowdy v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 180, 314 S.W.3d 722 ("We have previously held that it is appropriate for a trial court to consider a parent's past behavior as a predictor of likely potential harm should the children be returned to the parent's custody.")).

parent's imprisonment does not toll his responsibilities toward his child.[43] While in between stints of imprisonment, appellant had very few visits with the children and no other communication. Finally, at the time of the hearing, fourteen months after the kids were taken into care, appellant still had provided no proof of employment, income, or stable housing.

The burden is on the parent to demonstrate genuine, sustainable investment in completing the requirements of the case plan and following the orders of the court in order to retain reunification as the permanency goal.[44] The overriding intent of the legislature is to provide the state's children with safe, permanent homes.[45] Even full compliance with the case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for his or her child.[46] Given this evidence, this court is unable say that the circuit court was clearly erroneous in finding that the children would be at risk of potential harm if returned to appellant's custody or that the children are adoptable. Accordingly, we affirm the circuit court's best-interest finding.

---

[43]*Friend v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 606, at 12, 344 S.W.3d 670, 677 (quoting *Malone v. Ark. Dep't of Human Servs.*, 71 Ark. App. 441, 30 S.W.3d 758 (2000)).

[44]*Id.*, at 13–14, 344 S.W.3d at 677 (citing Ark. Code Ann. § 9-27-338(c)(5)(D)).

[45]*Pine v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 781, at 12, 379 S.W.3d 703, 710 (citing *Meriweather v. Ark. Dep't of Health & Human Servs.*, 98 Ark. App. 328, 255 S.W.3d 505 (2007)).

[46]*Wilson*, 2015 Ark. App. 666, at 7, 476 S.W.3d at 821 (citing *Ford v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 226, at 3, 434 S.W.3d 378, 381).

VI. *Other Arguments*

Appellant also argues that "[f]ailing to hold a permanency planning hearing also foreclosed [his] ability to appeal the failure to pursue a permanency plan of permanent custody with a relative." This is an extension of his permanency-planning-hearing argument that he did not raise below. A party cannot change his argument on appeal and is bound by the scope of his arguments made to the circuit court.[47] Even in termination cases, we will not address arguments raised for the first time on appeal.[48] However, this court notes that it is clear from the record that the circuit court heard evidence regarding a potential placement with Alber and considered the same as it discussed the possibility in its ruling from the bench. Appellant's reasonable-efforts argument was also raised for the first time on appeal, and therefore, is not addressed by this court.

Affirmed.

HARRISON and WHITEAKER, JJ., agree.

*Dusti Standridge*, for appellant.

*Mary Goff*, Office of Chief Counsel, for appellee Arkansas Department of Human Services.

---

[47]*Andrews v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 22, at 9, 388 S.W.3d 63, 68 (citing *Holiday Inn Franchising, Inc. v. Hospitality Assocs., Inc.*, 2011 Ark. App. 147, 382 S.W.3d 6).

[48]*Id.* (citing *Lyons v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 271).