ROBERT J. GLADWIN, Judge
Appellant James King appeals the March 30, 2018 termination of his parental rights (TPR) with respect to his minor son, T.K., entered by the Washington County Circuit Court. King argues that the circuit court (1) erred in finding statutory grounds to support TPR; (2) erred in finding that TPR was in T.K.'s best interest because it incorrectly analyzed the potential harm; and (3) committed reversible error when it did not file the TPR order until fifty-eight days after the hearing-twenty-eight days beyond the statutory requirement. We affirm.
I. Facts and Procedural History
The Arkansas Department of Human Services (DHS) exercised a seventy-two-hour hold on eight-year-old W.K. and seven-year-old T.K. (half-brothers) on October 24, 2016, removing them from the custody of their mother, Teilor Lybrand, after she was arrested on a warrant for child neglect.[1] It is undisputed that the children were not in King's custody when they were removed, and the circuit court recognized that King was not the cause of the removal. DHS filed a petition for emergency *229 custody, and the circuit court entered an order on October 27, 2016.
King was identified as T.K.'s putative father at the time of removal, and it was discovered that he was incarcerated in the Arkansas Department of Correction. King's history with DHS dates to 2009 when a true finding was made against him for shaking a child age three or younger and causing internal injuries and bone fracture-the victim in that incident was T.K. DHS records indicate that King was implicated in a total of five reports to the hotline that ultimately resulted in three true findings.
On November 2, 2016, the circuit court held a probable-cause hearing and found that probable cause to exercise emergency custody of T.K. existed and continued to exist. King was not present for that hearing. The first part of the adjudication hearing occurred on December 13, 2016, and concluded on January 20, 2017. The circuit court found T.K. dependent-neglected as a result of neglect and parental unfitness. King did not appear at the adjudication hearing although he was served with the summons, petition, and notice of the hearing.
On May 25, 2017, the circuit court held a review hearing that King did attend. An acknowledgement of paternity of T.K. was entered into the record, and the circuit court found that King was not in compliance with the case plan and court orders. A permanency-planning hearing was held on October 5, 2017, and the goal of the case was changed to adoption. King was present at the hearing, and the circuit court appointed him an attorney. In addition, the circuit court found that King still was not in compliance with the case plan and court orders and that he was making only "minimal progress."
DHS filed a TPR petition on December 29, 2017, collectively against Lybrand, Whittmore, and King, with respect to W.K. and T.K., alleging Ark. Code. Ann. § 9-27-341(b)(3)(B)(vii)(a) (Supp. 2017)-the subsequent-factors ground:[2]
That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juveniles in the custody of the parents is contrary to the juveniles' health, safety or welfare and that despite the offer of appropriate family services, the parents have manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parents' circumstances which prevent the placement of the juveniles in the custody of the parents.
The TPR petition also provided from the permanency-planning order, specifically with respect to King:
The Court also found that "James King has not complied with all the court orders and the case plan. Specifically-Mr. King is not in a situation where he can provide what these boys need. He cannot meet the needs of both children, or even the needs of [T.K.]. Mr. King has not demonstrated that he can maintain stability. Mr. King has not been in compliance once in this case." Mr. King did not begin to participate in any services offered by the Department until sometime after the Review Hearing, held before this Court on May 25, 2017. At that Hearing, the Court found that "Mr. King has not availed himself to this Court or the Department. He has not participated in services." It should be noted that Mr. King did not participate in services due to his being incarcerated *230 at the Arkansas Department of Correction for Domestic Battery 2nd, with [T.K.] as the victim of that crime. Mr. King is currently on parole until 2020.
....
The juveniles could not safely be placed in the custody of a parent at any point during the life of this case, due to the parents' noncompliance and poor choices. Despite the offer of appropriate family services-including home visits, case management, foster-care services, counseling referral, drug and alcohol assessment referral, and random drug screens-Mother, James King, and Daniel Whittmore have all demonstrated either that they are either unwilling or unable to remedy the subsequent issues that prevent the juveniles from being placed in their custody. No parent in this case has shown that they can provide stability for the juveniles or protect the juveniles and keep them safe from harm.
(Emphasis in original TPR petition.)
On January 31, 2018, the circuit court held a TPR hearing. Whitney Muller, the assigned family-service worker in this case since April 2017, testified that the children were in their fourth foster-home placement and had been there since August 2017. Muller testified that they are doing "very, very well." She described the children's progress since she was assigned, stating that at both boys were very shy and quiet. She explained that during their current placement, they had transformed and had become engaging, talkative, friendly, and excited. Their teachers told Muller that they had made great strides academically and socially after having been below grade level.
Muller testified that DHS had not considered a trial placement with Lybrand because she had not complied at any point during this case. She also explained that DHS had not been able to place the boys with King because of his history of true findings of having shaken T.K., causing a subdural hematoma and bone fracture. She confirmed that King had been arrested, charged, and incarcerated for domestic battery due to the incident that resulted in these true findings. Although Muller acknowledged that King had been in nearly full compliance since the last hearing, she clarified that over the entirety of the case there had never been a point in which he had been in full compliance.
With respect to T.K., Muller recommended that he remain with DHS; that at no point would it be safe for him to return to Lybrand's custody-that her rights be terminated; that due to the true findings against King, T.K. should not be placed in his custody out of concern for his safety; and that it was not in his best interest to ever be in King's custody.
Muller explained that T.K. was placed in resource services for reading, received occupational therapy where he works on skills that he would utilize in the classroom, such as handwriting, and had been evaluated to need vision therapy. She told the court that the special services T.K. received did not, in any way, prevent him from being adoptable.
The boys' foster mother-since their placement on August 11, 2017-testified and corroborated Muller's testimony regarding the boys' progress and changes since coming into her care. She further explained that other issues, such as day and night wetting; various fears; and explosive behaviors-which happened multiple times a day, including at school; and an inability to express emotions had greatly subsided. She acknowledged that T.K. does sometimes pout or cry but that he is able to talk through what is going on and is working with his therapist to talk about *231 emotions and how he is feeling. She confirmed that the boys are now outgoing, happy, smiling, and making eye contact. They talk to family and friends, are engaging at school, and are making good progress in school.
She specified that T.K. is in special education at school and that he is reading below a kindergarten grade level in the second grade. T.K. had a full psycho-educational evaluation through the school, and it found that he has special needs due to traumatic brain injury. He receives services for reading and math, resource services an hour a day, occupational therapy, individual help in the classroom, and participates in a home program for reinforcement. T.K. requires vision therapy because his eyes and brain are not able to work together to track from left to right, which is thought to also be due to the previous brain injury.
The foster mother confirmed that if the circuit court were to terminate parental rights, it is her desire to adopt both W.K. and T.K. She assured the court that the boys had bonded not only with her but also with her husband and two biological sons. She said that they have no behavioral issues or medical needs that would prevent someone from adopting them should she, for some reason, be unable to adopt them.
King testified, confirming his subsequent incarceration for third-degree battery from mid-June 2016 through January 2017 after a fight with Lybrand. He then attempted to explain the incident that resulted in the true findings of abuse in 2009, stating that he had shaken T.K. when he awoke to find two-month-old T.K. unresponsive in the bed with him, afraid for T.K.'s life. He did not take T.K. to the hospital until two days later. He pled guilty after being arrested and was incarcerated for seventeen months. He then stated he resumed his relationship with the boys and Lybrand on his release between 2011 and the 2016 incident.
With respect to his new apartment, King acknowledged DHS's concern about its being in a dangerous area, but he did not think it was a problem. He stated that he was working at McDonald's and doing his best to comply with court orders. He acknowledged that he would be on parole until 2020. He told the court that the individuals of concern listed in the CASA report would be strictly off limits to the boys.
Evidence was admitted of (1) his achievements while incarcerated, (2) payment of fines and fees, (3) clean drug screens, and (4) letters from his employer. But on cross-examination, King acknowledged that those achievements had occurred before the 2016 domestic-battery incarceration. His only explanation as to any steps he had taken to get his anger under control was to say that he had broken up with Lybrand.
The circuit court terminated King's parental rights by order filed on March 30, 2018, fifty-eight days after the TPR hearing. The TPR order stated that the circuit court considered and reviewed all the evidence submitted and the testimony of the witnesses and found that DHS had proved by clear and convincing evidence the following grounds:
a. The juveniles have been adjudicated by the court to be dependent-neglected and have continued to be out of the custody of the parents for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parents and correct the conditions that caused removal, those conditions have not been remedied by the parents.
b. The juveniles have lived outside the home of the parents for a period of twelve (12) months and the father, *232 [Whittmore], has willfully failed to maintain meaningful contact with his son, [W.K.].
c. Other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juveniles in the custody of the parents is contrary to the juveniles' health, safety, or welfare and that despite the offer of appropriate family services, the parents have manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parents' circumstances that prevent the placement of the juveniles in the custody of the parents.
d. The parents have subjected the juveniles to aggravated circumstances in that: a) there is little likelihood that services to the parents will result in successful reunification; b) [King] has abused a juvenile to the extent that it could endanger the life of the juvenile; and c) [Whittmore] has abandoned [W.K.]
e. A court of competent jurisdiction has found that [King] has committed a felony battery against [T.K.] that resulted in serious bodily injury to the juvenile.
The circuit court made specific findings with respect to King:
James King was convicted of the offense of Felony Battery against his child, [T.K.], and that the injuries suffered by [T.K.] resulted in serious bodily injury to [T.K.] and endangered his life. The Court finds that James King battered Teilor Lybrand after his release from prison. The Court finds that none of the parents are fit and that continuing contact between the parents and children would be harmful to the children.
In addition, the circuit court specifically found that it was in T.K.'s best interest to terminate King's rights:
The Court notes the history of violence by James King, the history of drug use by the mother[,] and the abandonment of [Whittmore] in support of this finding. The Court finds that both juveniles are very adoptable. Although [T.K.] has special needs associated with his traumatic brain injury, the Court finds that both children are flourishing in their foster home placement and that the placement has expressed an interest in adopting the children.
King filed a timely notice of appeal on April 4, 2018.
II. Standard of Review and Applicable Law
A circuit court's order terminating parental rights must be based upon findings proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3). Clear and convincing evidence is defined as that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. Bryant v. Ark. Dep't of Human Servs. , 2018 Ark. App. 375, 554 S.W.3d 295. On appeal, the appellate court reviews TPR cases de novo but will not reverse the circuit court's ruling unless its findings are clearly erroneous. Id. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. Id. In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the circuit court to judge the credibility of witnesses. Id.
In order to terminate parental rights, a circuit court must find by clear and convincing evidence that TPR is in the *233 best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the TPR petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii). The order terminating parental rights must also be based on a showing by clear and convincing evidence of one or more of the grounds for TPR listed in section 9-27-341(b)(3)(B). However, only one ground must be proved to support TPR. E.g. , Bryant, supra. The likelihood of adoption and potential harm, however, need not be proved by clear and convincing evidence, rather they are simply matters to be considered in the court's overall analysis of whether TPR is in the children's best interest. Hayes v. Ark. Dep't of Human Servs. , 2011 Ark. App. 21, at 5, 2011 WL 135198.
III. Statutory Grounds
King argues that the circuit court erred regarding the statutory-grounds element because, although DHS alleged just one ground in its TPR petition-subsequent issues-the circuit court based TPR on four grounds: (1) failure to remedy conditions that caused removal; (2) subsequent issues; (3) aggravated circumstances; and (4) felony battery against a juvenile. King argues that basing TPR on three grounds not pleaded violated his Fourteenth Amendment due-process rights. See Jackson v. Ark. Dep't of Human Servs. , 2013 Ark. App. 411, at 5-7, 429 S.W.3d 276, 279-80.
King maintains that the facts here are similar to those in Jackson. He claims that DHS did not plead against him the failure to remedy the conditions that caused removal, aggravated circumstances, or felony battery of a juvenile. Likewise, DHS did not amend its petition or move to conform to the evidence. Although the circuit court stated from the bench that it would terminate based on felony battery of a juvenile, King urges that that was too little notice too late. This court has found post- Jackson that DHS's failure to amend its petition or move to conform the pleadings to the proof prevents our review. See Moses v. Ark. Dep't of Human Servs. , 2014 Ark. App. 466, at 2, 441 S.W.3d 54, 55.
We disagree. First, with respect to the failure to remedy the condition that caused removal, we note that the circuit court referred to "parents" without specifying which ones. The order cites the statutory language for custodial parents, which does not apply to King because he was incarcerated when the children were removed from Lybrand's custody. See Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(a) .
Regarding the statutory ground DHS specifically alleged in its TPR petition-subsequent issues-DHS had to prove by clear and convincing evidence that (1) other issues arose after the dependency-neglect petition was filed in October 2016; (2) the other issues indicated that placing T.K. in King's custody was contrary to T.K.'s health, safety, or welfare; (3) DHS offered appropriate family services to address the issues; and (4) despite those services, King manifested the incapacity or indifference to remedy the issues or rehabilitate the circumstances that prevented DHS from placing T.K. in his custody. Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(a) .
King argues that the only findings of fact that the circuit court made as to him on this point were that he had been convicted of felony battery against T.K., that the injuries resulted in serious bodily injury and endangerment to life, and that he subsequently had been involved in a domestic-battery incident with Lybrand.
*234 King notes that each of those occurred before DHS removed the children in October 2016. He maintains that those issues could not constitute "subsequent issues" because they arose before DHS filed the dependency-neglect petition. Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(a) ; see also Poss v. Ark. Dep't of Human Servs. , 2014 Ark. App. 514, at 9, 443 S.W.3d 594, 599. Moreover, King submits that even if the preremoval incidents could be considered subsequent issues, DHS failed to introduce evidence that he had not remedied them. Additionally, King reiterates that DHS must prove each element of a statutory ground by clear and convincing evidence, and pursuant to section 9-27-341(b)(3)(vii)(a) , that DHS offered appropriate family services for the issue. King contends that DHS offered no evidence that it offered family services for his alleged anger issue.
We hold that sufficient evidence does support the circuit court's TPR decision based on the subsequent-factors ground. A parent's "failure to comply with the court orders and case plan [is] sufficient evidence of other factors arising subsequent to the filing of the original petition." Clements v. Ark. Dep't of Human Servs. , 2013 Ark. App. 493, at 10, 2013 WL 5273040.
The record is replete with evidence of King's failure to follow both the case plan and the circuit court's orders. When King finally appeared before the circuit court in the seventh month of the case, the circuit court found that he was not in compliance because he had not made himself available to the court or DHS, had not participated in services, and had not made progress toward completing the requirements of the court orders and case plan. King was ordered to cooperate with DHS; maintain weekly contact with the caseworker; keep DHS up to date with his contact information; abstain from illegal drug use; obtain and maintain stable housing and employment; maintain a clean, safe home for T.K.; follow the case plan and court orders; resolve all criminal charges; and follow the terms of his parole.
At the next hearing, the circuit court found that King still had not complied, stating:
[King] is not in a situation where he can provide what these boys need. He cannot meet the needs of [T.K.] [King] has not demonstrated that he can maintain stability. [King] has not been in compliance even once in this case. He has made minimal progress towards ... completing the court orders and requirements of the case plan. [King] has not made measurable, sustainable progress toward reunification with [T.K.], and [is] not following all court orders.
At the TPR hearing, Muller, the caseworker, testified that King was "nearly" compliant since the last hearing. But she also stated that "[a]s far as the entire case ... [h]e's never been in full compliance." DHS claims that King's eleventh-hour efforts were insufficient to prove that he had what it would take to be a safe and stable parent capable of adequately meeting the needs of T.K. See Burleson v. Ark. Dep't of Human Servs. , 2017 Ark. App. 616, at 8, 535 S.W.3d 655, 659. King's failure to comply with the case plan and the circuit court's orders constituted sufficient evidence to support the circuit court's TPR based on the subsequent-factors ground.
Additionally, DHS's court report provided evidence that King fell short in his ability to provide T.K. with a clean, stable home and further showed that he had failed to demonstrate the ability to protect T.K. and keep him safe from harm. This court has held that "[a] stable home is one of a child's most basic needs."
*235 Howell v. Ark. Dep't of Human Servs. , 2009 Ark. App. 138, at 13, 2009 WL 476076. The report from T.K.'s therapist confirmed that T.K. thrived in his foster home-an environment of "stability, consistency, and structure" that was vital to his development. King's inability to meet T.K.'s "most basic need" supports TPR based on the subsequent-factors ground.
Moreover, despite the traumatic brain injury King inflicted on T.K. that happened before the filing of the original dependency-neglect petition, it was the severity of the abuse King perpetrated on T.K. that subsequently prevented the circuit court from considering King for placement upon his release from prison and the establishment of paternity. We have recognized that a parent's past behavior is often a good indicator of future behavior. McGaugh v. Ark. Dep't of Human Servs. , 2016 Ark. App. 485, at 8, 505 S.W.3d 227, 232. The circuit court specifically took this into consideration:
Those are subsequent issues that came to the Court's attention after the original Petition for Dependency-Neglect that demonstrate that placing of these children with [King] is contrary to the children's health, safety and welfare. And that despite the services that DHS has provided, that father has the incapacity to show this Court that he won't subject these two little kids to more domestic battery or fracture somebody else's skull or cause traumatic brain injury through a shaking ... DHS caseworker Muller explained that DHS was "unable to consider a trial home placement for T.K. with his father, [King]" due to King's "history and true findings."
The circuit court recognized that it was the subsequent effect of King's prior actions that prevented placement of T.K. in King's custody and constituted a subsequent factor.
With respect to family services, DHS offered King family services by contacting him to determine his suitability as a caretaker, conducting a home study to assess the appropriateness of his home, and providing him services such as home visits, case management, transportation, and supervised visitation with the juveniles. In Brown v. Arkansas Department of Human Services. , 2018 Ark. App. 104, at 15-16, 542 S.W.3d 899, 907, this court affirmed that DHS is only required to offer-not necessarily provide-appropriate family services.
The circuit court made repeated findings that DHS had provided reasonable family services, none of which were appealed. See Miller v. Ark. Dep't of Human Servs. , 2017 Ark. App. 396, at 14, 525 S.W.3d 48, 57. This court has held that a lack of urgency supports a finding of failure to remedy subsequent factors despite appropriate family services being offered. Ewasiuk v. Ark. Dep't of Human Servs. , 2018 Ark. App. 59, at 18, 540 S.W.3d 318, 327. Based on this evidence, we hold that the circuit court did not clearly err in finding that DHS provided appropriate family services to appellant sufficient to support the subsequent-factors ground.
Finally, the circuit court also terminated King's rights based on the aggravated-circumstances ground--a ground supported by both oral and documentary evidence--and King failed to object to the finding at trial. Even in TPR cases, this court will not address arguments raised for the first time on appeal. Andrews v. Ark. Dep't of Human Servs. , 2012 Ark. App. 22, at 9, 388 S.W.3d 63, 68. Because King failed to raise a due-process argument to the circuit court, he is barred from raising it now. Sanderson v. Ark. Dep't of Human Servs. , 2012 Ark. App. 481, at 5, 2012 WL 4009599.
*236 We distinguish the facts of this case from the facts in Jackson , supra , in which this court held that the appellant was not placed on notice to defend against a particular ground because the circuit court took the matter under advisement without ruling from the bench, and the first specific mention of this ground was in the circuit court's TPR order. Conversely, here, the circuit court specifically stated in its oral ruling "that a court of competent jurisdiction has found [King] to be guilty of committing a felony battery that resulted in serious bodily injury" to T.K., which is "one of the aggravated-circumstances findings." See Potterton v. Ark. Dep't of Human Servs. , 2017 Ark. App. 454, at 2, 527 S.W.3d 769, 771-72 (holding that because appellant failed to develop this issue in the circuit court, noting particularly her failure to object to the court's clear finding of aggravated circumstances, the argument was not preserved for appeal); see Id. at 5 n.1, 527 S.W.3d at 772 n.1.
IV. Best-Interest Analysis
In addition to a statutory ground, a circuit court must also determine that TPR is in the child's best interest. Ark. Code Ann. § 9-27-341(b)(3)(A). In deciding best interest, the court must consider potential harm to the child. Ark. Code Ann. § 9-27-341(b)(3)(A)(ii). The circuit court conducts the potential-harm analysis in broad terms, need not identify a specific potential harm, and may consider past behavior as a predictor of future harm. Reid v. Ark. Dep't of Human Servs. , 2011 Ark. 187, at 14, 380 S.W.3d 918, 925. King argues that the circuit court committed reversible error in finding potential harm in this case. Rhine v. Ark. Dep't of Human Servs. , 2011 Ark. App. 649, at 7, 386 S.W.3d 577, 581.[3]
King submits that the circuit court's finding of potential harm was based solely on "the history of violence by" him. He states that this "history" consisted of two incidents that occurred seven years apart and that only the one involving Lybrand involved anger on his part. He claims that when looking at potential harm, one incident between parents does not mean a child is at risk of harm. King reiterates that Lybrand is now out of the picture, and her rights having been terminated; and he argues that the circuit court erred in finding potential harm.
We disagree. The "potential-harm inquiry is but one of the many factors that a court may consider, and the focus is on the potential harm to the health and safety of a child that might result from continued contact with the parent." Whitaker v. Ark. Dep't of Human Servs. , 2018 Ark. App. 61, at 15, 540 S.W.3d 719. "[T]he circuit court is not required to find that actual harm would result or to affirmatively identify a potential harm." Dozier v. Ark. Dep't of Human Servs. , 2010 Ark. App. 17, at 8, 372 S.W.3d 849, 853. "Potential harm must be viewed in a forward-looking manner and in broad terms." Nichols v. Ark. Dep't of Human Servs. , 2018 Ark. App. 85, at 13, 542 S.W.3d 197, 205.
Regarding potential harm, the circuit court specifically found that "[A]DHS has proven by clear and convincing evidence that any unsupervised, continuing contact between ... [T.K.] and [King] would be extremely harmful, very dangerous, and not in the children's best interest." In its written order, the circuit court stated:
*237 The Court finds by clear and convincing evidence that it is in the best interest of [T.K.] to terminate parental rights. In making this finding, the court specifically considered ... the potential harm to the health and safety of [T.K.] caused by returning [him] to the custody of the parents. The Court finds the testimony and documentary evidence demonstrate how ... [T.K.] would be at risk of potential harm if returned to any parent. The court notes the history of violence by [King] ... in support of this finding.
As compelling proof of potential harm, evidence was presented of King's history of violence and the fact that T.K. continues to suffer the effects of the trauma experienced at his hands. See McDaniel v. Ark. Dep't of Human Servs. , 2013 Ark. App. 263, at 5, 2013 WL 1776479 ; Dozier , 2010 Ark. App. 17, at 9, 372 S.W.3d at 854 (holding that a history of domestic violence indicates potential harm). Undisputed evidence was introduced that T.K. sustained a subdural hematoma --bleeding around the brain-and a bone fracture as a result of King's abuse. Subsequently, three true findings for child maltreatment were made against King. King admitted he caused these injuries by shaking two-month-old T.K., stating at the TPR hearing, "W.K. has seen me batter a family member twice. T.K. was an infant when I shook him." In addition, King was criminally charged and pled guilty to the felony offense of domestic battery 2nd degree. King was found to have "knowingly caused physical injury to a child under 12 years of age" and was sentenced to 120 months' imprisonment but served only seventeen months.
Testimony at the TPR hearing confirmed that T.K. still experiences the effects of this trauma. T.K.'s foster mother testified that T.K. had been "ruled as special needs due to traumatic brain injury." Furthermore, T.K. needed vision therapy due to his brain injury because "[h]is eyes and brain are not able to work together to track from left to right." As a result, T.K. "reads below kindergarten level in second grade." In its ruling, the circuit court accurately acknowledged that due to King's maltreatment, "[f]or the rest of his life, [T.K.] will have to work ten times harder than other kids his age to stay up."
The potential harm posed by King was further evidenced by his failure to benefit from services. Willingham v. Ark. Dep't of Human Servs. , 2014 Ark. App. 568, at 6, 2014 WL 5382622 (finding a parent's failure to benefit from services demonstrates risk of harm to a child). King was offered services while incarcerated in 2011 and completed courses in anger management and domestic violence. Yet because of his aggression issues, King was incarcerated a second time for third-degree domestic battery in 2016 following the domestic-violence incident involving T.K.'s mother, Lybrand. The circuit court determined that the domestic-violence and anger-management classes King completed had not changed his behaviors; instead, King blamed others for his actions. As a result, the circuit court assessed King to be unfit because his unchanged behavior demonstrated that he could not ensure T.K.'s safety.
The record also reflects King's past use of illegal drugs, which supports the circuit court's determination regarding potential harm. See Earls v. Ark. Dep't of Human Servs. , 2018 Ark. 159, at 13-14, 544 S.W.3d 543, 550 (affirming the circuit court's potential-harm finding that placement in the appellant's custody would be harmful due to the "history of substance abuse"); Banks v. Ark. Dep't of Human Servs. , 2010 Ark. App. 53, at 7, 2010 WL 183501 (holding history of drug use may constitute potential harm). The drug-test results King admitted into evidence confirm that he had used marijuana in the past. The *238 record indicates that on January 30, 2018--one day before the TPR hearing--King paid a fine to the Washington County District Court for a possession-of-a-controlled-substance charge obtained after his release from prison in early 2017. Because a parent's past behavior may be considered as a sign of future behavior, see Miller , 2017 Ark. App. 396, at 15, 525 S.W.3d at 58, King's history of drug use was further evidence supporting the circuit court's finding of potential harm in its best-interest analysis.
V. Untimely Filing of TPR Order
Finally, King correctly notes that a circuit court "shall" file a TPR order within thirty days after the hearing. Ark. Code Ann. § 9-27-341(e). Here, the circuit court waited fifty-eight days before filing the TPR order. King acknowledges that this court has said that compliance with this part of the statute is little more than a "best practice," see Newman v. Ark. Dep't of Human Servs. , 2016 Ark. App. 207, at 14, 489 S.W.3d 186, 194, and that the court's theory is that "there [is] no express sanction in the statute for untimely filing or any evidence that such a result was intended by the legislature." McPherson v. Ark. Dep't of Human Servs. , 2013 Ark. App. 525, at 4, 2013 WL 5371937. King submits that the court's prior decisions are incorrect and asks this court to construe "shall" to mean what it says.
This court has recently restated that "our precedents unequivocally hold that compliance with this part of the statute is little more than a 'best practice,' the violation of which does not warrant reversal or any other sanction." Blasingame v. Ark. Dep't of Human Servs. , 2018 Ark. App. 71, at 8, 542 S.W.3d 873, 877 (TPR order filed 127 days after hearing, and citing Wade v. Arkansas Department of Human Services. , 337 Ark. 353, 360, 990 S.W.2d 509, 514 (1999), where TPR order filed four months after the hearing); see, e.g. , Faussett v. Ark. Dep't of Human Servs. , 2017 Ark. App. 168, at 8, 2017 WL 1019021 (finding no error denying a motion to dismiss for not filing the TPR petition within thirty days from the permanency planning hearing as required by statute). For almost twenty years, this court has followed the precedent regarding untimely filings established by our supreme court in Wade , supra (holding failure to file an order within the mandatory timeframe laid out in the Juvenile Code does not result in a loss of jurisdiction "because the General Assembly did not provide a sanction for an untimely filing and because there is no evidence that such a result was intended") and reiterated the same recently in Nichols , 2018 Ark. App. 85, at 10 n.4, 542 S.W.3d at 205 n.4 (holding failure to enter a timely order does not warrant reversal or any other sanction and further stating that "the order entered by the circuit court was simply a written judgment of what the court had announced in open court; thus, [appellant] has suffered no real prejudice because the order was entered simply to show that which actually occurred").
This court has consistently held that a strong "litmus test" for reversible error is prejudice. See Picinich v. Ark. Dep't of Human Servs. , 2018 Ark. App. 288, at 5, 549 S.W.3d 916, 919 (Whiteaker, J., concurring) (failure to demonstrate any actual harm from the delay in the entry of the order supports affirmance); Newman , 2016 Ark. App. 207, at 10, 489 S.W.3d at 192 (failure to demonstrate prejudice suffered because of the delay in the filing of the TPR petition); Hill v. Ark. Dep't of Human Servs. , 2012 Ark. App. 108, at 6, 389 S.W.3d 72, 75 (concluding that reversal would not be appropriate in the absence of a showing of prejudice resulting from the time delay and failure to prove prejudice).
Without prejudice, a circuit court's error is recognized as harmless.
*239 Hooks v. Ark. Dep't of Human Servs. , 2017 Ark. App. 687, at 14-15, 536 S.W.3d 666, 674 ; Holland v. Ark. Dep't of Human Servs. , 2017 Ark. App. 205, at 6, 2017 WL 1277417. Further, King cannot show prejudice here when the TPR order was simply a reflection of what actually had transpired in the case-a TPR hearing wherein King was afforded a full and fair opportunity to litigate his substantial rights. See Nichols , 2018 Ark. App. 85, at 10 n.4, 542 S.W.3d at 205 n.4 ; Newman , 2016 Ark. App. 207, at 14, 489 S.W.3d at 195. As in Newman , there was "no evidence in this case that the trial court's failure to timely file the [TPR] order had the effect of making the [TPR] proceeding unfair or that it constituted a miscarriage of justice." Id. Instead, as in Newman and the present case, "[t]he timing of the filing of the [TPR] order had no effect on the [TPR] proceeding whatsoever." Id.
Our appellate-court precedents consistently demonstrate that the Juvenile Code must be interpreted with a juvenile's best interests in mind and that time requirements for filings and hearings should not be interpreted to require reversal when the legislature did not provide such a remedy and reversal would not be in a juvenile's best interest. See Ark. Code Ann. § 9-27-302 (Repl. 2015); McKinney v. Ark. Dep't of Human Servs. , 2017 Ark. App. 475, at 16-17, 527 S.W.3d 778, 789. While we acknowledge that timely filings of all court orders, not the least of which include TPR orders, constitute the best practice to which all courts should adhere, nothing in King's argument on this issue warrants the reversal of the above-cited, long-standing precedent.
Affirmed.
Abramson and Murphy, JJ., agree.

Neither Lybrand, W.K., nor W.K.'s father, Daniel Whittmore, are parties to this appeal-although they were part of the original TPR action.

The TPR petition also specifically alleged that Whittmore had abandoned W.K. pursuant to Arkansas Code Annotated section 9-27-341(b)(3)(B)(iv).

King challenges only the potential-harm element of the best-interest analysis; therefore, he abandons any other arguments against the circuit court's best-interest finding. See, e.g. , Anderson v. Ark. Dep't of Human Servs. , 2011 Ark. App. 522, 385 S.W.3d 367.