Cite as 2020 Ark. App. 91

# ARKANSAS COURT OF APPEALS

DIVISION II

**No.** CV-19-638

| | | |
|---|---|---|
| | | **Opinion Delivered:** February 5, 2020 |
| ADELA CHAVEZ | | |
| | APPELLANT | APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT [NO. 72JV-18-63] |
| V. | | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN | | HONORABLE STACEY ZIMMERMAN, JUDGE |
| | APPELLEES | AFFIRMED |

## WAYMOND M. BROWN, Judge

Appellant Adela Chavez appeals from the order of the Washington County Circuit Court terminating her parental rights to her five children, Y.C. (DOB: 08/02/2012), S.C. (DOB: 10/14/2013), A.H. (DOB: 09/16/2015), E.H. (DOB: 09/16/2015), and J.C. (DOB: 01/06/2017).[1] Although neither is a party to this appeal, the order also terminated the parental rights of Juan Arroyos, father of S.C., and Rosario Herreros, father of twins A.H. and E.H. On appeal, Chavez argues that termination of her parental rights was not in the children's best interest. We affirm.

On January 9, 2018, the Arkansas Department of Human Services (DHS) opened a protective-services case on the Chavez family following a true finding on allegations that

---

[1]Y.C. and J.C. were placed in the permanent custody of their respective fathers and ultimately granted name changes to reflect their fathers' last names. For clarity, we will reference them only by their original initials.

Juan Corona-Mota—Chavez's boyfriend—had committed sexual offenses against five-year-old Y.C.[2]  On January 16, another report was made for failure to protect, medical neglect, and cuts, bruises, and welts on the children by alleged offenders Chavez and Corona-Mota. The following day, family service workers Monika Isenhower and Paulina Guzman-Rivera conducted a home visit; however, at around that same time, the Fayetteville Police Department arrested Chavez for resisting arrest, assault on an officer, hindering apprehension (of Juan Corona-Mota), endangering the welfare of a minor in the second degree, and endangering the welfare of a minor in the third degree.  DHS exercised a seventy-two-hour hold on Y.C., S.C., A.H., and J.C. because Chavez's arrest left the children with no legal caretaker.  E.H. was not in the home at the time of Chavez's arrest.  Following Chavez's release from the Washington County jail the next day, DHS exercised a seventy-two-hour hold on E.H. when Chavez brought her to the DHS office.  An ex parte order for emergency custody was entered on January 22, placing custody of the children with DHS.

In the probable-cause order entered on January 24, the circuit court found that probable cause existed to continue custody of the children with DHS.  Specifically, the court found,

> It is contrary to the juveniles' welfare for them to return home to the custody of their mother at this time because there is a pending investigation regarding the mother allowing Juan Corona, who has a TRUE finding of sexual abuse with [Y.C.] as the victim, in her home in the presence of the juveniles.  There are concerns about the mother's ability to protect the juveniles from harm, also what appears to be cigarette burns on her son.

---

[2]Juan Corona-Mota was arrested by the Fayetteville Police Department for rape/sexual intercourse and second-degree sexual assault.

Additionally, the court found that DHS had a history of contact with the family, and "[t]he juveniles are to have NO CONTACT with their mother, Adela Chavez, and given today's testimony, it is not in children's best interest to see or visit with mom."

On March 14, 2018, the circuit court adjudicated the children dependent-neglected as a result of sexual abuse, neglect, and parental unfitness. In its detailed and extensive findings, the court stated:

> The Court finds by CLEAR AND CONVINCING EVIDENCE, even though the burden is preponderance of the evidence, that all five of these children are dependent-neglected. The Court finds today that Mother placed these children at substantial risk of serious harm as a result of sexual abuse, neglect, and parental unfitness. The Court finds that Mother allowed [Y.C.] to be around a man who was sexually abusing [Y.C.]. The Court finds that based upon all the evidence presented today, Mother knowingly hid out Juan Corona-Mota, knowing that DHS was investigating Mr. Corona-Mota for sexually abusing [Y.C.]. Detective Knotts testified that when he came to the home to find Juan Corona-Mota, Mother denied that he was in the home, but one of the children pointed to the closet. Detective Knotts then came into the home and he testified that Ms. [sic] Corona-Mota was hiding in the closet. The Court notes that the children are more truthful than their mother! The Court notes that FSW Isenhower spoke with Mother and that Mother told her she allowed Juan Corona-Mota to move back into the home because "it was cold" and there was no other place for him to do [sic], DESPITE knowing that Juan Corona-Mota was being investigated for sexually abusing [Y.C.]. The Court finds that there is CLEAR AND CONVINCING evidence that Juan Corona-Mota sexually abused [Y.C.], as CACD has found TRUE against Mr. Corona-Mota for Sex (Oral), Live Sex Acts, Sexual Contact, and Indecent Exposure.

> The Court further finds by CLEAR AND CONVINCING evidence, even though the burden is preponderance of the evidence, that Mother has exposed these children to hellish conditions over the past several years. The Court finds that the pictures of [A.H.], admitted into evidence today, shows that [A.H.]'s scars were clearly caused by cigarette burns.

> The Court finds that the testimony of Mother was NOT credible. The Court finds that Mother's testimony about the rash being the reason for the burns on [A.H.] is incredulous.

> The Court finds that in addition to Mother getting arrested for assault, endangering the welfare of a minor, and hindering apprehension, while the children were present, Mother put her children through horror, as she allowed a man in the

home who was raping Y.C. and her children have extensive cigarette burns. The Court finds that [A.H.] and [E.H.] have been horrifically abused by cigarette burns, and that both [A.H.] and [E.H.] have extensive food insecurities. The Court notes that the testimony of foster parents is that the children feel safe in their foster homes and that they know that nothing is going to happen to them while they're in the foster homes.

The Court also notes for the record that Mother has shown no emotion or remorse for anything that has happened to her children. The Court notes that it is clear today that Mother takes no responsibility for the hell these children have been exposed to.

The Court finds that Mother has subjected these children to aggravated circumstances by clear and convincing evidence, specifically, sexual abuse and extreme or repeated cruelty, evidence by the cigarette burns all over both [A.H.] and [E.H.]. The Court finds that the No Contact order between Mother and the children shall remain in effect as she was sent to jail today for Direct Contempt of Court for interrupting the Court during its' ruling twice.

In its adjudication order, the court also found Elmer Orellana to be Y.C.'s legal father and Juan Arroyos to be S.C.'s legal father. Orellana was granted supervised visitation with Y.C. Chavez was ordered to cooperate with DHS, inform DHS of her current contact information and any changes to her contact information, undergo a psychological evaluation, participate in individual counseling and follow all recommendations of the counselor, abstain from drug and alcohol use, submit to random drug screens, complete parenting classes, obtain and maintain stable housing and employment, maintain a safe home for herself and the children, demonstrate the ability to protect the children and keep them safe from harm, and maintain contact with her attorney. The children were ordered to remain in the custody of DHS.

In a special review order dated June 22, 2018, on the basis of DNA evidence, the court found Jose Bravo to be J.C.'s biological and legal father. Bravo was granted visitation with J.C. The court increased Orellana's visitation with Y.C. to include overnights and/or

weekends if the ad litem and DHS agreed. On July 18, an order was entered authorizing Y.C. to begin a trial home placement with Orellana. On August 9, the circuit court granted Orellana legal custody of Y.C.[3] The custody order also stated, "There shall be NO CONTACT WHATSOEVER between Adela Chavez, mother, and [Y.C.]."

On August 10, the circuit court found that it was in the best interest of the children to enter an order for no-reunification services as to Chavez in response to DHS's June 22 motion to terminate such services. The circuit court found that DHS had established by clear and convincing evidence that Chavez had subjected the children to aggravated circumstances, such that the children had been abandoned, chronically abused, subjected to extreme and repeated cruelty, Y.C. had been sexually abused, and that there was little likelihood that services to Chavez would result in successful reunification. The court specifically found Chavez's testimony not credible and ordered that the no-contact order remain in place.

Following the permanency-planning hearing, the circuit court ordered Y.C. to remain in the legal custody of her father, Elmer Orellana; authorized a plan to place J.C. in the custody of his father, Jose Bravo; changed the case goal to adoption; and authorized DHS to file a petition for termination of Chavez's parental rights as to all five children. The court found Chavez was in partial compliance with the court orders and case plan, noting "that mother failed to regularly attend counseling, maintain and [sic] stable home, maintain stable employment, and demonstrate an ability to protect her children and keep them safe

_____

[3]In January 2019, Orellana consented to the termination of his parental rights to Y.C.; however, he withdrew his consent to termination within the ten-calendar-day time frame allowed for withdrawal.

5

from harm. Mother has not made measurable and sustainable progress." The court further noted that Chavez's "income is inadequate to support herself, she has not demonstrated good judgment, and has difficulty taking responsibility." Again, Chavez was ordered to have no contact with the children. The court further found Rosario Herreros to be the legal father of twins A.H. and E.H. The court noted that it was in [Y.C.]'s "best interest to change the permanency goal to obtain placement with a fit relative."

On September 18, 2018, DHS filed a petition for termination of Chavez's parental rights alleging one statutory ground to support the termination: aggravated circumstances.[4] However, in February 2019, DHS moved to voluntarily dismiss the termination petition and for permanency-planning hearing, which the circuit court ultimately granted. Nonetheless, the attorney ad litem filed a petition for termination of Chavez's parental rights alleging aggravated circumstances to support the termination.

In the meantime, J.C. began trial home placement with his father, Jose Bravo, on October 31, and Bravo was granted custody of J.C. in December 2018. The custody order stated, "There shall be NO CONTACT WHATSOEVER between Adela Chavez, mother, and [J.C.]." Also in December, Luz Mendez was approved as a potential relative provisional placement for S.C., and the court authorized DHS to begin transitioning S.C. to the Mendez home.

---

[4]"Aggravated circumstances" includes that a juvenile has been abandoned, chronically abused, subjected to extreme or repeated cruelty, sexually abused, or a determination has been or is made by a judge that there is little likelihood that services to the family will result in successful reunification. Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)(B)(i)*.

In a February 2019 review order, the circuit court found, "Mother is in partial-compliance. Mother is not in full compliance as she has not demonstrated that she can keep the children safe from harm." The court noted that Chavez had made "some" progress toward alleviating the cause of the children's removal. The court again maintained the no-contact order between Chavez and the children.

On May 17, 2019, the circuit court entered an order terminating Chavez's parental rights to her children on the sole statutory ground alleged against her in the ad litem's termination petition: aggravated circumstances. The circuit court further found that termination was in the children's best interest considering both the likelihood of adoption and the risk of potential harm to the children if returned to Chavez. Regarding adoptability, the court found,

> Specifically, the testimony of DHS caseworker, Kari Horton who stated that [Y.C.], [S.C.], [A.H.], [E.H.], and [J.C.] are all great kids and they have no special medical or behavioral needs that would prevent them from being adopted. Further, the testimony of father, Elmer Orellana, is that he wishes to parent [Y.C.]; the testimony of provisional placement providers for [S.C.], Luz and Cesar, is that they wish to adopt [S.C.]; the testimony of foster parent for [A.H.] and [E.H.], Megan, is that she and her husband wish to adopt [A.H.] and [E.H.]; the testimony of father, Jose Bravo, is that he wishes to parent [J.C.]. The Court finds today that there is clear and convincing evidence that [Y.C.], [S.C.], [A.H.], [E.H.], and [J.C.] are all "highly adoptable" kids, as evidenced by the testimony of Kari Horton.

In considering the potential harm to the children if returned to the custody of Chavez,

> [t]he Court finds that Mother is not a fit parent today and that she cannot safely and appropriately parent these children, as Mother has consistently shown an inability to put her children's needs above her own and continues to rely on men rather than being able to provide for her children on her own. Mother's testimony today is that Daniel Ayala is on her lease and she couldn't have gotten her lease without him on the lease – "that's a big issue that she is supposed to be working on - relying on men – and Daniel Ayala was served at Mom's address. I don't think he is the sexual offender bc I believe Luz but Mom is still hooked up with a man."

Moreover, in the termination order, the circuit court found "[r]eunification at this point would negatively impact the children, and mother has not demonstrated an ability to keep the children safe and healthy or to accommodate their various mental, emotional, and physical needs as a result of the extreme abuse they suffered while in her custody." Chavez now appeals from the termination order.

This court reviews termination-of-parental-rights cases de novo.[5] Grounds for termination of parental rights must be proved by clear and convincing evidence, which is that degree of proof that will produce in the finder of fact a firm conviction of the allegation sought to be established.[6] The appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous.[7] A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made.[8] In resolving the clearly erroneous question, we give due regard to the opportunity of the circuit court to judge the credibility of witnesses.[9]

To terminate parental rights, a circuit court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted and (2)

---

[5]*Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001).

[6]*Tillman v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 119.

[7]*Id.*

[8]*Id.*

[9]*Id.*

the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent.[10] The circuit court must also find by clear and convincing evidence that one or more statutory grounds for termination exist.[11] Proof of only one statutory ground is sufficient to terminate parental rights.[12] Termination of parental rights is an extreme remedy and in derogation of a parent's natural rights; however, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child.[13] The intent behind the termination-of-parental-rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective.[14]

On appeal, Chavez does not challenge the sufficiency of the evidence supporting the statutory grounds for termination of her parental rights.[15] She argues only that the circuit court erred in finding that termination was in the best interest of her children.

---

[10]Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii).

[11]Ark. Code Ann. § 9-27-341(b)(3)(B).

[12]*Tillman, supra.*

[13]*Id.*

[14]Ark. Code Ann. § 9-27-341(a)(3).

[15]Chavez concedes that her failure to appeal from the adjudication order's finding of aggravated circumstances constitutes a waiver to such a challenge now. *See Hannah v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 502.

Chavez first attacks the adoptability factor of the circuit court's best-interest finding as it relates to Y.C. and J.C. She asserts that because Y.C. and J.C. are in the legal custody of their respective fathers, their adoptability is legally irrelevant and cannot support a best-interest finding. In *Bryant v. Arkansas Department of Human Services*,[16] Bryant made a comparable argument, contending that termination was erroneous because her child had achieved permanency through relative placement. The court stated,

> Under Arkansas Code Annotated section 9-27-338(c) (Repl. 2008), at the permanency planning hearing, the circuit court must make a permanency goal in accordance with the best interest of the juvenile. Section 9-27-338(c)(3)(A) provides that the court may "[a]uthoriz[e] a plan for adoption with the department filing a petition for termination of parental rights unless . . . [t]he juvenile is being cared for by a relative . . . *and* termination of parental rights is not in the best interest of the juvenile." (Emphasis added.) Citing this statute, Bryant contends that termination of parental rights is not preferred if the minor child is being cared for by a relative. Thus, because A.F. had been placed in the custody of a relative, Angela Carter, Bryant argues that the trial court improperly determined that termination of parental rights was an appropriate permanency plan.

> This argument, however, relies upon a statute that pertains to the permanency-planning hearing and the fifteen-month review hearing, and not the termination hearing itself. In *Velasquez v. Arkansas Department of Human Services*, 2011 Ark. App. 168, this court found that a similar argument was not preserved:

>> The bar in this case is that appellant failed to bring up the record of the permanency-planning hearing where the goal was changed to termination of parental rights. While a termination order might bring up all intermediate orders, appellant did not designate the permanency-planning hearing in his notice of appeal, effectively waiving an argument that would relate to the trial court's decision which seems to run contrary to the clear language of Arkansas Code Annotated section 9-27-338(c)(3)(A). It is appellant's burden to bring up a record that demonstrates error. *Cassidy v. Ark. Dep't of Human Servs.*, 76 Ark. App. 190, 61 S.W.3d 880 (2001).

> *Velazquez*, 2011 Ark. App. 168, at 5.

---

[16]2011 Ark. App. 390, 383 S.W.3d 901.

Likewise, in the case at bar, Chavez failed to designate the permanency-planning hearing in her notice of appeal. Moreover, the transcript of the permanency-planning hearing is not in the record. Her failure to bring forth a sufficient record precludes this court from reaching the merits of her argument.[17]

As stated in the circuit court's termination order, caseworker Kari Horton testified to the adoptability of the children, concluding that each of them is adoptable despite the difficulties they now have due to the instability they experienced while in the custody of Chavez. A caseworker's testimony that a child is adoptable is sufficient to support an adoptability finding.[18]

Chavez next challenges the circuit court's finding that her children were at risk of potential harm if termination of her parental rights was not granted. Regarding Y.C., J.C., and S.C., Chavez contends that because they had achieved permanency through kinship placement—Y.C. and J.C. with their respective fathers and S.C. with a relative—termination was unnecessary as it did not further the goal of the termination statute, which is to provide permanency in a child's life.

In support of her contention, Chavez cites *Cranford v. Arkansas Department of Human Services*,[19] in which this court reversed the circuit court's decision to terminate the rights of the child's parents when the child was in the permanent custody of the maternal grandparents. However, *Cranford* is distinguishable from the present case. The child in

---

[17] *See Burkhalter v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 520.

[18] *Boomhower v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 397, 587 S.W.3d 231.

[19] 2011 Ark. App. 211, 378 S.W.3d 851.

*Cranford* resided with his grandparents both before *and* after the dependency-neglect case began and not with the parents from whom custody was removed.[20] The grandparents were already actively engaged and playing a significant role in the child's life.[21] Here, unlike the child in *Cranford*, the children did not remain in the home environment to which they were accustomed. The permanency that Y.C., J.C., and S.C. achieved, although with relatives, was through new living arrangements, not merely a continuation of the status quo.

Furthermore, in *Cranford*, this court noted that in finding no potential harm to support best interest for termination of parental rights, "there was no evidence that either parent had ever physically abused or harmed S.C. or were a threat to do so in the future."[22] The same cannot be said here. Chavez was found to have exposed her children to extreme abuse, both sexually and physically. Therefore, despite Chavez's urging to the contrary, we hold that *Cranford* provides no basis for reversal.

As to twins A.H. and E.H.—the only children out of the five not placed with relatives—Chavez argues that "it was not in the twins' best interest to be adopted by strangers and legally separated from their other three siblings." While the impact a termination decision has on a child's relationship with a relative may be a relevant consideration within the best-interest analysis, Chavez failed to develop her argument beyond that bare assertion. A mere conclusory statement without convincing argument or

---

[20]*Id.*

[21]*Id.*

[22]*Id.*

authority is not effective to raise a point on appeal.[23]   Furthermore, Chavez did not introduce evidence to the circuit court regarding the relationship that the twins shared with their siblings.  Evidence of a genuine bond between siblings is required to reverse a best-interest finding based on the severance of a sibling relationship.[24]

Chavez also contends that she poses no threat to the children; thus, the circuit court's finding as to the potential-harm factor of the best-interest analysis is not supported by sufficient evidence.  We disagree.

The potential-harm inquiry is only one of many factors that a court may consider, and the focus is on the potential harm to the health and safety of the children that might result from continued contact with the parent.[25]  The assessment of the potential-harm factor is conducted in broad terms, and the circuit court is not required to find that actual harm would result or to affirmatively identify a potential harm.[26]  Chavez knowingly exposed her children to a man that her daughter, Y.C., reported had been sexually abusing her.  Even after the allegations, Chavez hid Juan Corona-Mota in her home, hindering his apprehension on charges of raping Y.C.  Chavez also assaulted a police officer during the arrest of Corona-Mota.  Chavez stated that despite the sexual-abuse allegations, she allowed Corona-Mota back into her house because it was cold and he had no place else to go.  As stated in the circuit court's termination-of-parental-rights order, Chavez "has consistently

---

[23]*Hall v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 245, 413 S.W.3d 542.

[24]*Brown v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 370, 584 S.W.3d 276.

[25]*Whitaker v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 61, 540 S.W.3d 719.

[26]*King v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 464, 562 S.W.3d 226.

shown an inability to put her children's needs above her own and continues to rely on men rather than being able to provide for her children on her own." Moreover, the children also suffered from horrific physical abuse as evidenced by cigarette-burn scars. Past behavior may be considered as a predictor of future potential harm.[27]

While Chavez contends that there is "little harm" in affording her the time to reunify with her children, as she has been unable to prove herself a fit and proper parent due to the no-contact order that has been in place throughout the case, we reiterate that parents' rights will not be exercised to the detriment of the children.[28]

For the reasons stated herein, we affirm the order terminating Chavez's parental rights.

Affirmed.

VIRDEN and SWITZER, JJ., agree.

*Leah Lanford*, Arkansas Commission for Parent Counsel, for appellant.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor children.

---

[27]*Id.*

[28]*Hoffman v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 856, 380 S.W.3d 454.